Salomon R. SANDEZ, Jr., Appellant,

v.

UNITED STATES of America,
Appellee.

No. 15016.

United States Court of Appeals
Ninth Circuit.

Nov. 28, 1956.

William T. Pillsbury, Ernest L. Graves, Long Beach, Cal., for appellant.

Laughlin E. Waters, U. S. Atty., Louis Lee Abbott and Norman W. Neukom, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before LEMMON, FEE, and BARNES, Circuit Judges.

BARNES, Circuit Judge.

Defendant Sandez was one of six defendants charged with conspiring to bring narcotic drugs into the United States (Count 10). He was charged with two substantive counts relating to the importation (Count 8) and transportation (Count 9) of narcotics. Five of the six defendants were convicted; one (Golden Elliott) was acquitted by the court, upon motion of her counsel, after the jury had difficulty in coming to a decision as to her guilt or innocence. Sandez was convicted on three counts (Counts 8, 9, and 10); defendant Flores of two. (Counts 9 and 10.)

Sandez alone appeals. His counsel strenuously argues there was reversible error in that:

1. defendant Sandez was never arraigned.

2. certain evidence introduced against Sandez was inadmissible, because obtained thru unlawful search and seizure.

3. the corpus delicti was not established independent of certain admissions, which were not admissible as against Sandez.

4. insufficiency of the evidence to support the verdict against Sandez.

The prosecution of these defendants came about by reason of dealings between a government undercover agent, Laurence Katz, operating under the alias of Benny Lean, and one Vincent Perno, usually known as Vince. Their dealings came to a dramatic conclusion on April 15, 1955, about 8:00 p.m., the time set for delivery of and payoff for the narcotics.

Perno in his dealings with Katz made use of certain telephones located in the Los Angeles area. Among others, one was the number PLeasant 8-1879. This number was listed to the woman defendant: Golden Elliott, who occupied an apartment at 6603 Avalon Blvd., Los Angeles, California. Defendants Perno, Brown, Greer and Elliott were all present at such premises during the fateful day of April 15th, 1955. Defendant Elliott was there only in the morning and in the evening, having worked full time at her regular job that day. There was no testimony that either Flores or Sandez were there on that day, or on any other day.

On that same April 15th, 1955, in accordance with instructions from Perno, Agent Katz rented a room at Ray's Motel, in the 6300 block on So. Figueroa, Los Angeles. From there, Perno, Katz and Katz's partner, agent Wm. Jones, went to a Greyhound Station at 2525 E. Florence Blvd., Los Angeles, where the price to be paid for the narcotics, (a supposed $25,000) was placed by Katz in a public locker, he retaining the key.

Upon returning to Ray's Motel, Katz talked to Perno at PLeasant 8-1879. After some delay, Perno came to contact Katz and Jones, the government agents, at the Ray Motel; and led them by automobile to the place where the narcotics allegedly were to be delivered, after they had supposedly been brought to Los Angeles from Mexico. This was the New Main Motel, located between 70th and 71st on Main St., Los Angeles. This was at 7:40 p.m.; and after some delay Perno, Katz and Jones entered Room 1 of the New Main Motel. Just prior to that entry two men, later identified as Greer and Brown, left Room 1. They went to a parked car on 70th St., and about 8:00 or 8:10 p.m. that night they were arrested sitting in the car at that spot.

During the entire day of April 15th, 1955, Perno had been shadowed by other federal government agents or county deputy sheriffs. That evening, when Katz and Jones in their car followed Perno in his car from Ray's Motel to the New Main Motel, they were "tailed". When the officers following parked their auto on Main St., where they could observe the front entrance to Room 1, they found their car 15 or 20 feet ahead of a 1953 Chevrolet convertible automobile bearing Baja California license plates. There were two occupants therein, later

identified as Sandez and Flores. Sandez twice left his car, walked to the corner, and back again. He looked around, at the two cars, at the Motel, and "sort of wrung his hands."

Nothing in the record indicates that either Sandez or Flores, while in the vicinity of 71st and Main, communicated with, or saw, the men within Room 1, or those entering it, or those leaving it.

In that room, No. 1, Perno delivered to Katz the narcotics which were to be purchased. After testing it to be certain it was contraband, Katz and Jones placed Perno under arrest. Perno drew a gun, but was himself shot before he could use it. Agent Katz then stepped outside and fired his gun in the air, as a signal. Whereupon the officers outside placed Sandez and Flores under arrest, and searched them.

■ The signal indicated to the officers outside that the arrest had been made; that illegal narcotics had been delivered; and that the conspiracy was at an end. They were thus enabled to make a lawful arrest. The fact that the officers knew that others were involved in the commission of a felony; that an automobile bearing Mexican license plates was parked, at night, near the spot designated for delivery, was enough, together with Flores' and Sandez' own actions, to justify an arrest.

■ The search having been made incidentally to a lawful arrest, it was itself legal. As Justice Minton stated,

"The right to search the person incident to arrest always has been recognized in this country and in England." United States v. Rabinowitz, 339 U.S. 56, 60, 70 S.Ct. 430, 432, 94 L.Ed. 653; Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543.

■ Further, had there been any question of illegal search, the obligation was upon the defendant to move to suppress the evidence after indictment. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652. Price v. Johnston, 9 Cir., 125 F.2d 806, certiorari denied 316 U.S. 677, 62 S.Ct. 1106, 86 L.Ed. 1750.

Failing to make such a motion, he has waived his objection, Segurola v. United States, 275 U.S. 106, 48 S.Ct. 77, 72 L. Ed. 186, unless there exist extenuating circumstances. Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145.

When Sandez was searched there was found on him:

(a) an insurance identification card, covering a 1953 Chevrolet automobile, made out to "Sr. Salomon R. Sandez." [Ex. 26] [1]

(b) a business card, bearing the printing:

"Dr. Eloy Ovando H.,
 Medico

Telefonos 677 Calle 3A, Y Ave. 'G'
 572 R Tijuana, B.C."

with the printed telephone numbers scratched thru and the number "3623" written in ink. On the reverse of this card, written in pencil by an unknown writer, appeared "Vince,—PL-97818". This number was the phone number of Golden Elliott, *provided*, that the numerals are read in reverse order.

Search of Flores revealed:

a similar business card of Dr. Eloy Ovando H., Medico, [Ex. 25] bearing on the reverse penciled notations, reading

*Eddie Sonelly*
Pleasant 8-1879

which was the phone number of Golden Elliott. Written in ink on the front of the card was the word:

Senaly

and some figures not referred to in the testimony. The printed telephone numbers of the "Medico" were not scratched out on this card. Although one Eddie Sonnellie was named as a defendant, his name came into evidence principally in connection with Exhibit 29, a letter,

---

1. All exhibits mentioned are plaintiff's exhibits.

which was finally offered only as against the defendant Perno.

Meanwhile, Perno was searched in the ambulance on the way to the hospital and in his wallet was found a card, [Ex. 27] generally similar to those found on Sandez and Flores; namely the card of

Eloy Ovando H.

Medico

Telefonos 677 Calle 3A, Y Ave. "G"

572-R Tijuana, B.C.

with the printed telephone numbers scratched out and numbers 3623 and 3563 written in.

On the reverse, in ink there appears:

Freddie Sandez

Ave. "F" No. 115

Apt. "C"

Tijuana, B.C.

There was no testimony as to who *Freddie* Sandez was, or whether Salomon R. Sandez, Jr. was connected with, or related to Freddie in any way.

Plaintiff's Exhibit 6 is the American Airlines schedule card, given by Perno to Katz, bearing the phone number PL. 8-1879; the number thru which Katz was instructed to contact Perno.

At this point in the evidence then, we have Sandez present physically near the scene of the delivery of certain narcotics supposedly brought to Los Angeles from Tijuana, Baja California, Mexico. The time was early evening. Sandez was apparently anxiously awaiting some unknown event, seated in an automobile bearing Baja California license plates, in company of one Flores. They both carried business cards of a certain Tijuana doctor. On the reverse of Flores' card was a phone number; which was incriminating to the extent that the number had been one of great importance to the success of the conspiracy. On Sandez' card, the same prefix appeared; and the same digits, tho arranged in reverse order. The defendant Perno carried a similar business card, with the name of one Freddie Sandez, of Tijuana, on it.

Entirely apart from any admissions or statements of co-conspirators, there thus existed some substantial evidence to tie both Flores and Sandez into the conspiracy. This presented an issue of fact, on which the jury was entitled to, and did, find adversely to the appealing defendant. There being substantial evidence in existence for the triers of fact to pass upon, we cannot disturb that verdict on appeal. Penosi v. United States, 9 Cir., 206 F.2d 529. It is not for this court to reevaluate the evidence, or substitute our judgment for that of the jury.

This brings us to the conversations.

These conversations are important in this case. They are usually important in conspiracy cases. They must be considered here, not only in relation to the conspiracy count, but in respect to the substantive counts. There was sufficient evidence, aliunde the conversations, to present the conspiracy count to the jury. Is this likewise true of either or both of the substantive counts?

Before considering specific conversations, it becomes necessary to determine when the conspiracy ended. We think that the moment of any conspirator's arrest is decisive as to him, even if it should be maintained that the arrest of the first conspirator is not conclusive as to all. At that moment, the conspiracy has been thwarted, and presumably no other overt act contributing to the conspiracy can possibly take place at least so far as the arrested conspirator is concerned. In the Fiswick case, the Supreme Court laid down the rule that although the result of the conspiracy may be a continuing one, the conspiracy itself does not become a continuing one. Because an overt act is necessary to complete the offense under § 37 of the Criminal Code as charged in the Fiswick case, (as it is here, under U.S.C.A. Title 18, § 371 [2]) and because the statute of limita-

---

2. U.S.C.A. Title 18, § 371, "If two or more persons conspire * * * and one or more of such persons do any act to effect the object of the conspiracy * * *."

tions runs from the last overt act during the existence of the conspiracy—"the overt acts averred and proved may thus mark the duration, as well as the scope, of the conspiracy."

■ The last overt act charged in the conspiracy count herein was the sale on April 15th, 1955, by Perno to Katz of the 54 ounces and 385 grains of heroin. Upon delivery thereof by Perno to Katz, and the arrest of Perno, the conspiracy ceased. " * * * While the act of one partner in crime is admissible against the others where it is in furtherance of the criminal undertaking, * * * all such responsibility is at an end when the conspiracy ends. * * * Confession or admission by one coconspirator after he has been apprehended is not in any sense a furtherance of the criminal enterprise." Fiswick v. United States, 379 U.S. 211, at page 217, 67 S.Ct. 224, at page 227, 91 L.Ed. 196.

■ The trial court here properly instructed the jury in accordance with the above principle.

" * * * after a conspiracy has come to an end, either by the accomplishment of the common design, or by the parties abandoning the same, evidence of acts or declarations thereafter made by any of the conspirators can be considered only as against the person doing such acts or making such statements. The declaration or act of a conspirator not in execution of the common design is not evidence against any of the parties other than the one making such declaration.

"Any statement or admission made by a person after his arrest must be considered as having been made after a criminal conspiracy has been ended and any such statement or admission may be considered by you only in connection with the guilt or innocence of that person." [R. p. 742]

With this rule of law in mind, we come to appellant's point III; that there was insufficient evidence to support the ver-

dict of guilty as to Counts 8 and 9. First, because the corpus delicti was not established aliunde the admissions of Sandez, and secondly, it was error to admit such admissions, called "conversations" in appellant's brief.

■ Appellant's position seems to be that the corpus delicti, to be established, must not only show the commission of the crime charged, but, as well, those who perpetrated it. With this we cannot agree.

To paraphrase one of the leading cases:

"Most American courts take the view that the phrase 'corpus delicti' includes first, the fact of an injury or a loss, and secondly the fact of somebody's criminality (in contrast e.g. to accident) as the cause of injury or loss. The proof of these two elements involves the commission of a crime by somebody. But the phrase 'corpus delicti' does not include the fact of the connection of the accused with the crime—his identity as the criminal, or the guilty agent thru whom the wrong has occurred." Manning v. United States, 10 Cir., 215 F.2d 945, at page 947; United States v. Echeles, 7 Cir., 1955, 222 F.2d 144; United States v. Di Orio, 3 Cir., 1940, 150 F.2d 938; George v. United States, 1942, 75 U.S.App.D.C. 197, 125 F.2d 559, 563; United States v. Markman, 2 Cir., 1952, 193 F.2d 574, 576.

■ The corpus delicti may be proved by circumstantial evidence. United States v. Di Orio, supra; Dimmick v. United States, 9 Cir., 116 F. 825, certiorari denied 189 U.S. 509, 23 S.Ct. 850, 47 L.Ed. 923.

■ Clearly in this case the evidence established that *someone* imported and *someone* transported narcotics from Mexico to Los Angeles. The corpus delicti of Count 8, importation, and Count 9, transportation, was proved.

We must then determine which of the conversations, if any, were admissible

against the person talking as an admission, and (if not made by the person they implicate), whether they were therefore hearsay, or were made during the course of a conspiracy, and hence admissible against all partners in the conspiracy.

It becomes necessary to review the conversations.

*Conversation Number 1.*

The first conversation in evidence concerning the defendant Sandez was related by witness Katz as the statement of defendant Perno made to him on the morning of April 15th, 1955, at Room 715 of the Constance Hotel in Pasadena, California.

Perno "told me everything was all right, and he went on and elaborated that his connection, who he called Tutu, brought the heroin, the two kilos of heroin up from Mexico the previous day * * * He said that this connection, Tutu, was the nephew of the Governor of Lower California * * *" [R. p. 61]

*Conversation Number 2.*

After his arrest, defendant Sandez was interrogated by Officer Jones.

I asked defendant Sandez if that was his correct name. He said "yes". I then asked the defendant Sandez if he was known also as "Tutu". He said "That's right". I asked the defendant Sandez if he and Flores had come to the Los Angeles area from Mexico in the 1953 yellow convertible carrying the narcotics. He said "Yes". He said he was the owner of El Gato Negro Bar in Tijuana. He produced a card, a business card of some kind, to verify this. He stated he also had some taxi-cabs in Tijuana.

*Conversation Number 3.*

Jones testified Flores told him in the County Jail that Sandez was known as Tutu. [R. p. 219] The written statement Flores gave at the jail [Ex. 16] did not contain the word Tutu. [R. p. 220]

*Conversation Number 4.*

Jones asked Flores, after the arrest, whether he (Flores) and Sandez had been together in the automobile, and "had come up from Mexico with a package of narcotics. He (Flores) stated he had and that he and Sandez had been paid $100.00, in Tijuana, by an unknown man "to bring the package up here and deliver it to Perno". [R. p. 227]

*Conversation Number 5.*

Deputy Sheriff Cook talked with Sandez and Flores on the night of the arrest, in the Federal Bldg. Sandez said he did not understand English well, that Flores could understand English well, so Cook told Flores he could explain the questions to Sandez in Spanish. Cook then advised Sandez of his constitutional rights, and the charges against him of violation of the Federal narcotics laws. Flores spoke to Sandez in Spanish. Flores then, under questioning, said he and Sandez had come up from Mexico the previous day (the 14th) to see Vince (Perno). That they hadn't seen him; had returned to Tijuana; and had returned to Los Angeles on the 15th and were waiting to see him when they were arrested.

Flores then told Cook that he (Flores) and Sandez had received two packages of narcotics from a man in Mexico, that they were to get $100.00 for bringing the narcotics to Perno, that they came up on the 14th, returned to Tijuana, came up on the following day (the 15th) that he, Flores, just prior to his arrest, had given the narcotics to Vince (the defendant Perno) at the corner of 71st and Main Sts. Flores said the narcotics had been in the trunk of the vehicle,— two bags only. [R. p. 343]

Sandez, *at this time*, made no statement in English other than that he could not understand English well.

*Conversation Number 6.*

Deputy Sheriffs Rushin and Buchanan arrested defendants Flores and Sandez near the scene of delivery. Sandez said "I am not doing anything—what do you want—I am just waiting for somebody", or words to that effect.

*Conversation Number 7.*

Later that evening of April 15th, 1955, in the Federal Building Flores told Rushin he (Flores) and Sandez were to re-

ceive $100.00 for bringing the narcotics up here and delivering them to Perno. "I asked him where he had the narcotics. He told me when they went by the customs, they laid them on the floor of the car, and had them covered with newspapers. That they had received no money yet."

*Conversation Number 8.*

Still later on the evening of the 15th of April, 1955, Flores told Rushin "I brought it up myself for the $100.00, and this other fellow, Sandez, didn't know anything about it. I asked him if he was afraid of anything, and he told me that defendant Sandez was the Governor of Baja California's nephew, and that he had a wife and child in Mexico, he would like to help, but he couldn't."

Officer Rushin, on cross-examination said that Sandez also told him he (Sandez) was a nephew of the Governor of Baja California.

*Conversation Number 9.*

Flores said he did not pick up the narcotics in Mexico, but in San Diego, and that in San Diego he met the defendant Sandez, and that Sandez just gave him the ride up there because he had nothing better to do.[3]

Conversation Number 1, made by a conspirator during the course of the conspiracy would be binding on Sandez insofar as Count 10 is concerned, but not as to the substantive counts.

Conversation Number 2 recites an admission made by the defendant Sandez, which establishes his participation in both the crimes charged in Counts 8 and 9.

Conversation Number 3 was inadmissible as to Count 10, and immaterial as to any element of Counts 8 and 9.

Conversation Number 4 was inadmissible as to Sandez on any count.

Conversation Number 5 was a statement by Flores incriminating Sandez, not admissible as to Sandez under Count 10, because the conspiracy had

terminated, and only binding on Sandez if he understood the English meaning of the words, and if he had the duty, so understanding English, to deny its substance.

Conversation Number 6 was inadmissible as to Count 10, and of no evidentiary value as to Counts 8 and 9.

Conversation Number 7 was not binding on either Flores or Sandez as to Count 10, and not binding on Sandez, as to Counts 8 and 9 unless he was present, understood it, and was required to deny it.

Conversation Number 8: The first part with Flores, if true, exculpates Sandez, and the second part, with Sandez would add corroboration to Count 10, if admissible, which it was not, and would add no evidentiary value to proof of Counts 8 and 9.

Conversation Number 9 was evidence of Flores's guilt on Count 9, but of Sandez' innocence.

Thus the only "conversations" binding on Sandez, tending to prove Counts 8 and 9, were Conversations Number 2, 5 and 7.

These last two further rest on the doubtful proposition that Sandez understood fully the statements made by Flores in English and therefore he was required to deny the accusation. Could Sandez stand mute?

The general rule is that when an incriminating statement is made in the presence and hearing of the defendant, and not denied or objected to by him, the statement and his failure to deny, are admissible against him. Gentili v. United States, 9 Cir., 22 F.2d 67. But the inference or conclusion of guilt can only be drawn if there is no other interpretation equally consistent with his silence. State v. Bates, 99 A.2d 133, 140 Conn. 326. Here his admitted difficulty, or his professed inability, to understand English supplies such an interpretation. Further there is no duty,

---

3. It was stipulated that the booking slips showed that Flores had $97.00 on his person when booked, Sandez by stipulation had $20.00. [Ex. 16]

*after arrest,* for one to deny an accusatory statement. Yep v. United States, 10 Cir., 83 F.2d 41; United States v. Lo Biondo, 2 Cir., 135 F.2d 130. But see: Sparf and Hansen v. United States, 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343; Dickerson v. United States, 62 App.D.C. 191, 65 F.2d 824.

The only testimony on this matter is that of the Witness Mrs. Bay. She observed the defendant Sandez during the trial. "The man can't speak English. He understands maybe a word or two." [Tr. p. 657]

This was uncontradicted, either by cross-examination of this witness, or by any rebuttal testimony. It was opposed by the government witness telling of his conversation with respect to the lights on his car, and its weak battery. It was supported by the fact that an interpreter was used when Sandez was booked.

█ Thus the only clearly admissible conversation binding on Sandez as to Counts 8 and 9, is Conversation Number 2. It is our duty to "exercise great care in determining whether the statements of the accused were corroborated." United States v. Calderon, 348 U.S. 160, at page 164, 75 S.Ct. 186, at page 188, 99 L.Ed. 202.

For a very recent discussion of this difficult subject, see Opper v. United States, 348 U.S. 84, at page 89, 75 S.Ct. 158, at page 162, 99 L.Ed. 101.

"In the United States our concept of justice that finds no man guilty until proven has led our state and federal courts generally to refuse conviction on testimony concerning confessions of the accused not made by him at the trial of his case. Wigmore, Evidence (3d ed.), § 2071. See Warszower v. United States, 312 U.S. 342, 345, note 2, 61 S.Ct. 603 [85 L.Ed. 876]. We have gone further in that direction than has the common law of England. There the courts have been hesitant to lay down a rule that an uncorroborated extrajudicial confession may not send an accused to prison or to death. In our country the doubt persists that the zeal of the agencies of prosecution to protect the peace, the self-interest of the accomplice, the maliciousness of an enemy or the aberration or weakness of the accused under the strain of suspicion may tinge or warp the facts of the confession. Admissions, retold at a trial, are much like hearsay, that is, statements not made at the pending trial. They had neither the compulsion of the oath nor the test of cross-examination. They are competent as an admission against interest. * * *

"In Warszower v. United States, 312 U.S. 342, 348, 61 S.Ct. 603, 606, 607, we held that although the only proof of an essential element of making a false statement was admissions to the contrary prior to the crime charged, sufficient to convict if found true, such an admission would take the case to the jury. We said such admissions 'contain none of the inherent weaknesses of confessions or admissions after the fact.' We think that an accused's admissions of essential facts or elements of the crime, subsequent to the crime, are of the same character as confessions and that corroboration should be required. See 1 Greenleaf, Evidence (16th ed.), § 216; Smith v. United States, 348 U.S. 147, 75 S.Ct. 194 [99 L.Ed. 192].

"The need for corroboration extends beyond complete and conscious admission of guilt—a strict confession. Facts admitted that are immaterial as to guilt or innocence need no discussion. But statements of the accused out of court that show essential elements of the crime, here payment of money, necessary to supplement an otherwise inadequate basis for a verdict of conviction, stand differently. Such admissions have the same possibilities for error as confessions. They, too, must be corroborated. See Wilson v.

United States, 162 U.S. 613, 621, 16 S.Ct. 895, 899, 40 L.Ed. 1090."

█ Before deciding this problem of corroboration, we should, as part of that problem, consider the effect on the jury of the manner in which Exhibit 29 went to the jury.

This exhibit was a letter, in longhand, together with a typewritten copy thereof.

It was dated April 14th, 1955. It was written by a defendant charged in the conspiracy count, who was not before the court for trial. It was introduced in evidence [Tr. 400] as to all defendants. It was shown to the jury as evidence against all defendants [Tr. p. 470]. Their consideration of it was not restricted by any instruction of the court *at that time*. This was so because it was in evidence as to all defendants when the jury examined it. A separate motion was made that it be admitted into evidence as to all defendants. [Tr. p. 482] It was only after all evidence had been introduced, and counsel were arguing their respective motions and had reached the evidence as to Sandez, that the government, after urging its admissibility as to all defendants, retreated, and urged its admissibility as to Perno only. [Tr. p. 537] The court properly instructed the jury, that Exhibit 29 was to be used solely against Perno. [Tr. p. 550 and 558] The importance of this was properly emphasized by the Court in his general instructions. [Tr. p. 725]

It was undoubtedly admissible as to Perno. But it was damaging in the extreme to Sandez. This was recognized by counsel for the government when he used it to oppose Sandez' counsel's motion for acquittal. [Tr. p. 499] It tied Sandez into the conspiracy count (upon which there was substantial evidence to go to the jury), and into the substantive counts (upon which the evidence was weak).

The reception of this evidence was further emphasized as to Sandez (alleged to have been known as "Tutu") by the red ink marks which half-heartedly attempted to block out a reference to "Tutu".

These red ink marks are drawn thru the following:

"Tutu is taking a pound of that good stuff to cut the stuff and he will give it to you. You take that and * * *"

A small "p" was made large in red ink, and the letter went on: "Put a pound of milk sugar"; and the words, "with it" were then crossed out in red ink, and the letter continues: "and hide it some place else without either of these guys knowing."

Whoever attempted to block out with red ink the message transmitted, if that is what was done, did not try very hard. No explanation appears in the record concerning this red ink addition. The typewritten copy of the letter, attached to the original, is not marked or deleted in the slightest degree. Whatever was attempted, it strongly underlined and emphasized the participation of Tutu in "taking the stuff", from Tijuana to Los Angeles, the heart of the substantive charges against Sandez.

Could the court "unring the bell" by subsequently instructing the jury that Exhibit 29 was admissible only against Perno? We think it doubtful. Perhaps the harm was slight in the conspiracy count. Sufficient substantial evidence existed aliunde to permit the jury to convict Sandez on Count 10. But was there sufficient substantial evidence establishing Sandez' participation in the substantive counts? Was Exhibit 29 the corroborative evidence the jury was forced to find before it could convict on the substantive counts? If there had been *other* substantial evidence, corroborating the alleged admissions, we might say, "no"; but we find no other substantial corroborating evidence in the record. If the jury did not find the corroboration in Exhibit 29 (after the court's careful instructions to them that they should disregard Exhibit 29, except as to Perno),

where was the corroboration sufficient to authenticate Sandez' alleged oral admission?

There exists one other manner in which the jury might have found corroborative evidence of Sandez' alleged admission as to the substantive counts.

We note at page 483 of the transcript the motion of the government as follows:

"And then I wish to move, your Honor, while that motion had its application primarily to the conspiracy count, I likewise move, as it is consistent with the charges contained in the other counts, where there is more than one defendant named, as the evidence would apply to such count—by illustration, Count 8, where the names Sandez, Flores and Sonellie occur—as to all other counts where there are multiple defendants named, I move that the testimony of any witness which has an application to those counts be admitted against the codefendants in such counts."

"The Court: Other than the persons actually named in the testimony?"

"Mr. Neukom: That is right, sir."

"The Court: All right." [Tr. p. 483, l.–22 to p. 484, l.–10]

It is not clear that the government did or did not intend, specifically, that Perno's statement to Katz respecting his source of supply from Tutu, was to be used against Sandez. The motion made by counsel is ambiguous.

At page 549 the court advises the jury:

"The only action of which I want to apprise you, with which you are concerned, is to tell you that the court has granted the motion you heard Mr. Neukom make on behalf of the Government of applying all the testimony given by the witnesses, and all the exhibits, except Exhibits 7 and 29, to all of the defendants under the conspiracy count, which is Count 10, and to the various defendants who are concerned in the individual counts, which merely means that any testimony relating to one defendant as to any of the counts may be considered by you as to the others.

"In making that ruling, I am ruling merely on a legal question. I am not determining what weight you are to give to the testimony, and, if in your opinion, the testimony of any witness as to any of the defendants is not strong enough to apply it to the other, that is up to you.

"All I am telling you is that as a legal proposition I have ruled that all of this testimony may be considered by you as to these particular defendants, that is, as to all of the defendants under Count 10, and as to the individual defendants as to the other counts.

"The two exhibits that were excluded are Exhibit 7, which is the gun, which has been offered only as to the defendant Perno, because no one else is charged with assisting or aiding in the matter—that is the assault which is charged in one count against Perno—and then Exhibit 29, which is a letter in ink signed, 'Eddie Sonellie,' a typewritten copy of which is also attached to aid the jury in reading it. That also applies only to Perno, and not to the others." [Tr. p. 549, l.–10 to p. 550, l.–12]

It is not clear from this what the court meant when it said:

"any testimony relating to one defendant as to any of the counts may be considered by you as to the others."

Did "others" refer to *counts*, or to *defendants*? This advice of the court to the jury is ambiguous.

Objection was duly made by counsel for Sandez. [Tr. p. 530, et seq.]

The danger of the jury's misunderstanding this consolidation motion was further accentuated by the trial court's failure to admonish the jury as to the

limited admissibility of Perno's statement. It may well be that the jury not only considered the statement on Count 10, but also that it regarded the statement as the necessary corroborative evidence as to the two substantive counts.

 Sandez may well have been guilty of Counts 8 and 9. The tell-tale Dr.'s cards, his presence at 70th and Main, his Baja California automobile may all raise inferences of his guilt as to the substantive counts; they are direct circumstantial proof of his being a member of a criminal conspiracy, but they do not prove nor corroborate the substantive counts. We hold there was insufficient corroboration of the defendant Sandez' admission as to the substantive counts. Further, Sandez' admissions as to the substantive counts were oral. We think under the close and peculiar facts of this case that it would have been better practice for the court, sua sponte, to instruct the jury that the oral admissions of Sandez were to be received with caution. Wigmore, § 866, 3d Ed., p. 356; Cf. People v. Bemis, 33 Cal.2d 395, 202 P.2d 82.

We are not impressed with the government's attempt to bind a defendant with the statement of his confederates, absent a conspiracy, and absent the statement being part of the res gestae. There may be factual situations where such a rule of evidence should prevail, but we see no reason for it in this case.

 We have not discussed appellant's first point, that Sandez was never arraigned. The record shows this point is without merit. The minutes of the court, dated May 23rd, 1956, show that Sandez was arraigned, his plea of not guilty entered, and that counsel of his choice represented him at that time in said court. The Reporter's transcript shows that Mr. Angelillo specifically waived the reading of the indictment. [Appendix, Appellee's Brief, p. 3]

The judgment of conviction of defendant Sandez as to Count 10 is affirmed; the judgment of conviction of defendant Sandez as to Counts 8 and 9 is reversed.

Affirmed in part, and reversed in part.