UNITED STATES of America,
Plaintiff-Appellee,

v.

Spencer MARQUES,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Mark Reason BELCHER,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Harry LEROY, Defendant-Appellant.

Nos. 78–1800, 78–1801 and 78–3011.

United States Court of Appeals,
Ninth Circuit.

May 14, 1979.

As Amended on Denial of Rehearing and
Rehearing En Banc July 24, 1979.

Marcus S. Topel, Harry L. Hellerstein (argued), Lawrence Callaghan (argued), San Francisco, Cal., for defendants-appellants.

Sanford Svetcov, Chief, Asst. U.S. Atty. (argued), San Francisco, Cal., for the United States.

Before CARTER, BRIGHT * and CHOY, Circuit Judges.

JAMES M. CARTER, Circuit Judge:

All three appellants were convicted of conspiracy to manufacture methamphetamine in violation of the Controlled Substances Act, 21 U.S.C. § 846 (1976). They were acquitted of charges of manufacturing methamphetamine and possession with intent to sell (21 U.S.C. § 841(a)(1) (1976)). They raise a variety of claims regarding alleged improprieties in the investigation and arrests, and in the manner in which the trial was conducted. We affirm their convictions.

* Hon. Myron H. Bright, U.S. Circuit Judge, Eighth Circuit, sitting by designation.

## I. FACTS

Sometime in October, 1976, Spencer Marques contacted chemical companies in the San Francisco Bay area and tried to purchase certain chemicals used as precursors in the manufacture of methamphetamine, a controlled substance listed in 21 U.S.C. § 812 (1976) as having a high potential for abuse, some current medical usefulness, but lending itself to psychological dependence. The companies which he contacted told him he could not legally purchase them unless he obtained a "number" from the federal Drug Enforcement Administration (DEA). To that end, he contacted Ann Carter, a compliance investigator with the DEA, to obtain a number. She allegedly warned him that possession of such chemicals was illegal under California law, but she did not otherwise discourage him from trying to obtain them. She also made notes of her discussions with him, but they were destroyed prior to the trial. Subsequent to Ms. Carter's first contact with Spencer Marques, she contacted a clandestine laboratory investigating unit and told it of Marques' interest in the chemicals. That unit in turn contacted various chemical supply houses in the Bay area and asked to be kept informed of further attempts by Marques to obtain the chemicals. It appears that the unit gave certain supply houses permission to sell the chemicals and marked equipment to Marques between November, 1976, and May, 1977.

During this same time period, one DEA agent, Ron Davis, posed as a potential methamphetamine purchaser and insinuated himself into Marques' confidence. Davis observed chemicals and various items of chemistry equipment in Marques' possession and being delivered to the home of his brother, William Marques, in Menlo Park, California. Also, in discussions with Davis, Spencer Marques portrayed himself as a big-time manufacturer capable of producing up to 100 pounds of methamphetamine per month, and as a major supplier of that drug to the Hell's Angels. However, there was no direct evidence that Spencer Marques ever actually produced any Methamphetamine.

On May 23, 1977, Spencer Marques informed Davis that he was about ready to sell and that Davis should call him the next day to arrange delivery. Also on the 23d, other DEA agents assigned to the investigation followed William Marques (previously mentioned by Spencer Marques as a potential dealer) and Daniel Stewart (a frequent associate of William Marques). On May 24th, the agents observed Stewart leaving a Lake Tahoe hotel carrying a brown suitcase and a black attache case. He drove a Rambler automobile to a secluded area in Alpine Meadows, continued up a country road to an unidentified house, and was temporarily lost from the view of the DEA agents. He reappeared shortly and was followed back to Lake Tahoe where he met William Marques in a parking lot, removed the black attache case from the trunk of his car, showed the contents to Marques and placed the case in the back seat of his car. Agents were unable to see inside the attache case. Both Stewart and William Marques then left the Lake Tahoe area and returned to Menlo Park.

Meanwhile, agent Davis had called Spencer Marques as requested and had been told to call back in half an hour. When he called back, Spencer told him he suspected he was being watched by narcotics agents and called off the sale. Shortly thereafter, he was arrested and consented to a search of his residence. Incriminating evidence—but no methamphetamine—was seized.

A warrant to search William Marques' home in Menlo Park was also executed, and equipment and precursors were found. While that search was still in progress, William Marques and Stewart drove up in the Rambler, having arrived from Lake Tahoe. William Marques was arrested and searched, and a small package of methamphetamine was found on his person. The car was then searched. Inside the black attache case were found two large packages of methamphetamine. This gave the agents probable cause to arrest and search Stewart, and in his wallet was found a note which read: "Danny—call Harry at Ricks

at Tahoe—916–583–6553." This information was relayed the next day to agents in Lake Tahoe, who traced the phone number to a house in the secluded area in Alpine Meadows to which agents had earlier followed Stewart. One of the agents went to the door, asked for "Harry", and obtained a sample of methamphetamine from Harry Leroy, one of the appellants here. He was arrested. Agents then obtained a warrant and searched the house. Paraphernalia and small amounts of drugs were found, but no laboratory equipment. Among the items seized were chemistry books, recipes for the manufacture of methamphetamine, and a jacket belonging to appellant Belcher on which methamphetamine residue was found. Persons in the house, including Belcher, were arrested.

En route back to the Lake Tahoe police station, the agents came upon a parked van about one-quarter mile from the house. Observing through the windows, they saw what appeared to be laboratory equipment and chemicals inside. The next day, the van was searched pursuant to a warrant and large amounts of methamphetamine were found in addition to equipment, much of which had been marked by DEA agents prior to its delivery to Spencer Marques. The van had been rented by Harry Leroy about one week earlier.

Convictions and these appeals followed. In a separate trial growing out of the same set of facts, Daniel Stewart was convicted of possession of methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). William Marques pled guilty at the same trial. Stewart's conviction was affirmed by this court in *United States v. Stewart*, 595 F.2d 500 (9th Cir. 1979), No. 78–1787, West p. 1163, April 19, 1979.

## II. ISSUES

The following issues are raised by one or more of the appellants:

A. Was the search of the car and of the attache case found therein, without a warrant, improper, so as to require suppression of evidence seized in that search, and evidence seized as fruits of that search?

B. Does evidence of a compromise verdict and evidence of possible improper influence on one or more jurors require that the verdict be set aside?

C. Did destruction of Ms. Carter's notes violate *United States v. Harris*, 543 F.2d 1247 (9th Cir. 1976), and if so, does this require reversal?

D. Did the trial judge's questioning of certain witnesses constitute impermissible judicial interference so as to deny appellants a fair trial? Was there prosecutorial misconduct which denied appellant Marques a fair trial?

E. Does the fact that the trial judge gave one jury instruction arguably out of sequence constitute reversible error?

F. Was evidence obtained from appellant Marques through his cooperation and after he allegedly dropped out of the conspiracy improperly admitted against him?

G. Was testimony regarding "Harry" unfairly prejudicial to appellant Harry Leroy, and was testimony regarding his prior criminal activity irrelevant and unduly prejudicial, thus requiring reversal?

H. Did the seizure of Belcher's chemistry books and his jacket exceed the scope of the search warrant so as to require suppression?

## III. DISCUSSION

### A. *The Search*

■ Both Marques and Leroy argue that the warrantless search of the attache case found in the Rambler automobile did not fall within any exception to the Fourth Amendment prohibition against such searches, and they argue therefore that the methamphetamine found in the case should have been suppressed, along with all the fruits of that search. The fruits included: (1) the note found in Stewart's wallet, which led to (2) the confrontation with "Harry" and his arrest, followed by (3) the warranted search of the Alpine Meadows house, wherein were found paraphernalia and drug residue, and (4) the discovery of the van with large amounts of methamphetamine and the laboratory.

The validity of this same search has already been upheld by another panel of this court. *United States v. Stewart*, 595 F.2d 500 (9th Cir. 1979). Neither Marques nor Leroy has provided us with any compelling reasons for distinguishing that decision on doctrinal or factual grounds. We therefore adopt the reasoning in that opinion and hold that both the evidence seized in that search, and evidence obtained as a result of that search, were properly admitted.

### B. *Jury Misconduct and Improper Influence*

Following the trial, one of the jurors swore in an affidavit that (1) the jury had reached a compromise verdict as to appellants Belcher and Leroy, and (2) another (unnamed) juror had observed all four defendants getting into a car together during the trial period. This latter assertion allegedly constituted improper outside influence on the jury because the event allegedly never took place, and one of the defenses raised to the conspiracy charge was that the defendants did not know each other. Both points were brought to the attention of the trial judge in an attempt to have the verdict set aside, or at least to have an evidentiary hearing to explore the allegations, but the judge declined to do so.

■ As to the allegation concerning a compromise verdict, appellants argue that such a verdict is, in effect, a verdict by lot, and this is prohibited under Section 5.7(b) of the American Bar Association Project dealing with minimum standards for criminal justice.[1] Appellants cite no authority for this proposition, and their argument does not go beyond the bald assertion that the two types of verdicts are the same. We disagree.

Whereas a verdict by lot is, by definition, a chance result with no logical foundation in the evidence, a compromise verdict is the product of jury consideration of the evidence tempered by lenity or by a desire to avoid jury deadlock. It goes without saying that when a jury renders either of the two verdicts, it exercises a power which it does not possess. *See Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 40, 76 L.Ed. 520 (1932). Nevertheless, the practical problems of administering the criminal justice system require that a claim of compromise verdict be treated differently from a claim of verdict by lot. Whereas the latter does violence to the basic principle of proving guilt beyond a reasonable doubt,[2] the former is less egregious and may lend itself to a variety of interpretations, many of which do not warrant reversal. For the foregoing reasons, we reject the appellants' analogy, and look instead to Rule 606(b), F.R.Evid., for the principles which govern the use of juror testimony to impeach a verdict.

Rule 606(b) declares that a juror is incompetent to testify,

> "as to any matter . . . occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent or dissent from the verdict . . . or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror."

---

1. In its context, that section reads as follows:

"(a) Upon an inquiry into the validity of a verdict, no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror or concerning the mental processes by which the verdict was determined.

"(b) The limitations in subsection (a) shall not bar evidence concerning whether the verdict was reached by lot."

2. And even then, no case that we have been able to find has held that such a verdict *must* be reversed. We may assume without deciding that the ABA standard is the proper rule, and that the validity of such a verdict may be questioned, but we note that the Supreme Court in *McDonald v. Pless*, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915) declared jurors incompetent to impeach their own verdict, even where a verdict by lot was alleged (albeit in a civil case).

The rule constitutes a codification of the common law principle that a juror may not impeach his own verdict, but it also constitutes an attempt to eliminate the effects of improper influence and juror misconduct which the old rule ignored.

We have found no case holding a compromise verdict invalid *per se.* Many teach the contrary. *E.g., Stein v. New York,* 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 (1952); *Dunn, supra; Hyde v. United States,* 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912); *United States v. Mulligan,* 573 F.2d 775 (2d Cir. 1978), *cert. denied,* 439 U.S. 827, 99 S.Ct. 99, 58 L.Ed.2d 120 (1979); *United States v. Green,* 523 F.2d 229 (2d Cir. 1975), *cert. denied,* 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976); *United States v. Harary,* 457 F.2d 471 (2d Cir. 1972); *O'Rourke v. United States,* 347 F.2d 124 (9th Cir. 1965); *United States v. Grieco,* 261 F.2d 414 (2d Cir. 1958), *cert. denied,* 359 U.S. 907, 79 S.Ct. 582, 3 L.Ed.2d 572 (1959). This being the case, the appellants must show to our satisfaction that (1) the verdict resulted from improper outside influence which (2) prejudiced them; otherwise Rule 606(b) precludes inquiry into the validity of the verdict.

The affidavit alleging the compromise verdict states the following with respect to outside influence:

> "Because of psychological pressures inside the courtroom combined with the *external pressure of the judge keeping us* until 11:00 p.m., Friday . . . and until 10:00 p.m., Monday, . . . and knowing that the judge would probably keep us late again until some verdict was reached, the jury reached a compromise verdict in this case." Affidavit of Christine Chiovare, Record at p. 611 (emphasis supplied).

The sole alleged outside influence, then, was the judge's decision to keep the jury late a couple of nights. This was within the discretion of the trial judge and was entirely proper. This issue therefore founders on the first requirement of Rule 606(b).

 Other claims in the affidavit relate to the mental operations and emotional reactions of the jurors, as to which the authorities are in unanimous agreement that jurors are incompetent to testify. Advisory Committee Notes, Rule 606(b), F.R. Evid.; 8 Wigmore, Evidence § 2349 (McNaughton rev. 1961) (collecting cases and citing authority). From all appearances, the compromise verdict, if there was one, was reached by the jurors on their own. "Needless to say, [a] letter[ ] which indicated that the jurors on their own might have reached a compromise verdict did not warrant the granting of a new trial." *United States v. Mulligan,* 573 F.2d at 778. *Accord, United States v. Green, supra; United States v. Grieco, supra.* We therefore reject appellants' contention that because the verdict was allegedly compromised, it should be reversed.

 We likewise find no merit in the appellants' contention that the incident in which one unnamed juror allegedly saw the four defendants entering a car together constituted improper outside influence which prejudiced them. The affidavit in which this issue is raised states only the following:

> "One of the jurors stated that outside the courtroom she saw the 4 defendants getting into a car together during a court recess." Affidavit of Christine Chiovare, Record at p. 612.

It does not say that the information was passed on to all the other jurors, that it was discussed, or that it was even considered by the jurors in their deliberations. In light of this bare bones assertion and the fact that appellants had the burden of persuading the trial court that the allegation warranted a new trial, or at least further inquiry, we cannot say that the court below abused its discretion in rejecting appellants' motion. While it is possible to conclude that because improper outside influence was alleged, the affiant was competent under Rule 606(b) to testify regarding it, there was absolutely no showing that the appellants were in any way prejudiced by the incident. This weakness in the evidence was fatal. *See United States v. Eagle,* 539 F.2d 1166 (8th Cir.), *cert. denied,* 429 U.S.

1110, 97 S.Ct. 1146, 51 L.Ed.2d 563 (1976); *Government of the Virgin Islands v. Gereau,* 523 F.2d 140 (3d Cir. 1975), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976).

### C. *Destruction of Ms. Carter's Notes*

■ Marques and Leroy contend that the destruction of the notes (which DEA compliance investigator Carter took in conjunction with her interview with Marques) violated the rule against such destruction found in *United States v. Harris,* 543 F.2d 1247 (9th Cir. 1976) and that her testimony at trial should have therefore been stricken. These appellants claim that they were unfairly prejudiced by the testimony because, although Ms. Carter testified she had warned Marques that possession of methamphetamine precursors was illegal in California, reference to that warning did not appear in her typed summary of the interview. They claim that her destruction of the notes made it impossible to impeach her testimony. They apparently hoped that if the warning did not appear in the written report, it would not be found in the notes either, and the truthfulness of her oral assertion could be challenged.

The *Harris* rule prohibits the destruction of rough notes "taken by FBI agents in interviews either with prospective government witnesses or . . . with the accused [because they] constitute potentially discoverable materials." 543 F.2d at 1248. Their destruction thus violates the Jencks Act, 18 U.S.C. § 3500 (1976) and Rule 16, F.R.Crim.P. While it is possible, as the government suggests, to distinguish this case from *Harris* on the grounds that Marques was neither the object of a criminal investigation nor a potential government witness at the time the interview occurred, and Ms. Carter was not an FBI agent, we are not persuaded that the distinctions are strong enough to hold that the rule was not violated. We choose instead to assume without deciding that the *Harris* rule was

violated when the notes were destroyed, but we reject appellants' request for reversal because the destruction constituted harmless error.

Ms. Carter was extensively and vigorously cross-examined regarding the discrepancy between her testimony and the written report. The fact that the rough notes were destroyed was brought to the attention of the jury, as were the inferences that could be drawn from that fact, viewed in light of the discrepancy. We conclude that whatever prejudice might have resulted from the destruction of the notes was effectively neutralized during cross-examination, and that the remedy otherwise available under *Harris* need not be applied here. *See United States v. Shields,* 571 F.2d 1115 (9th Cir. 1978); *United States v. Wood,* 550 F.2d 435 (1976); *United States v. Parker,* 549 F.2d 1217 (9th Cir.), *cert. denied,* 430 U.S. 971, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977).

### D. *Judicial and Prosecutorial Misconduct*

■ Marques and Belcher claim that by having asked questions of witnesses which allegedly undermined the defense's case, and by otherwise involving himself directly in the conduct of the trial, the judge engaged in conduct which warranted declaration of a mistrial. We disagree. The incidents of judicial conduct to which appellants refer as being the most serious constitute, for the most part, attempts to clarify testimony.[3] This is an approved practice, as is judicial questioning generally, as long as the court avoids "the appearance of giving aid to one party or another." *United States v. Allsup,* 566 F.2d 68, 72 (9th Cir. 1977); *United States v. Malcolm,* 475 F.2d 420 (9th Cir. 1973). *Compare United States v. Hickman,* 592 F.2d 931 (6th Cir. 1979).

We likewise reject appellants' claim that it was error for the trial judge to refuse to allow them to argue a theoretical defense based on entrapment *per se,* discussed in

---

**3.** Other objections are based on comments made outside the hearing of the jury or comments made to enforce rulings on the limitation of evidence, also approved judicial activities.

*See United States v. Allsup,* 566 F.2d 68 (9th Cir. 1977); *United States v. Malcolm,* 475 F.2d 420 (9th Cir. 1973).

*United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). This alleged error was never raised below and is therefore not properly before us.

Appellant Marques contends that certain statements made by the prosecutor during opening and closing arguments and in rebuttal argument inflamed and misled the jury to the extent that he was denied a fair trial. Specifically, he refers to the prosecutor's mention in opening statement of a connection between him and Hell's Angels, and of his plan to supply them with 100 pounds of methamphetamine per month. He also objects to prosecutorial references in closing argument to meetings and discussions between him and the other two appellants, arguing that no direct evidence was ever produced which showed Marques even knew the other two. Finally, he objects to the prosecutor's implication that because he was an "officer of the court", he was somehow more credible than other counsel.

■ Marques' first objection has the most merit, but it is not sufficient to warrant a new trial. It is reversible error for a prosecutor to intentionally inject into a trial the spectre of organized crime, where it serves no proper purpose and is without foundation in the evidence. *United States v. Love,* 534 F.2d 87 (6th Cir. 1976). In *Love,* reversal was mandated because of prosecutorial references to the Mafia. We assume for purposes of discussion that the prejudice which attaches to being linked to Hell's Angels is as odious as that which comes with being linked to the Mafia. Nevertheless, *Love* differs significantly from this case because there, absolutely no evidence was produced which tied the defendant to the Mafia, whereas here, evidence was admitted at the trial which showed that Marques himself said Hell's Angels were to be his biggest customers; he had plans to sell them 100 pounds of methamphetamine per month. While the evidence as a whole led to the conclusion that this was a perverse form of puffing on Marques' part, we cannot say that mention of it in the prosecutor's opening statement constituted reversible error.

■ Likewise, the prosecutor's references in closing argument to meetings and conversations between Marques and the other two appellants had inferential support in the evidence presented. Such inferences are permitted as long as the prosecutor does not "misstate or exceed the evidence in any significant respect." *United States v. Parker,* 549 F.2d 1217, 1222 (9th Cir.), *cert. denied,* 430 U.S. 971, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977). A review of the evidence here shows that the jury could have reasonably inferred that Marques knew and met with the other two appellants even though he contended he had not.

■ Finally, whatever minimal prejudice may have resulted from the prosecutor's characterizing himself as an officer of the court was neutralized by the judge's observation that all counsel occupy that position.

### E. Sequence of Jury Instructions

■ Marques argues that the jury was prevented from properly considering one of his defenses; namely, that the evidence which the government presented proved two separate conspiracies and he was not a member of the conspiracy charged in the indictment. An instruction was given which pointed out this possibility to the jury, and Marques agreed with both the form and the content of that instruction. He objected, however, to the fact that it was not given in the order in which he would have preferred. Rather than being given in conjunction with other conspiracy instructions, the separate conspiracy instruction was given later, in conjunction with instructions relating to other counts. While it may have been preferable for the trial judge to have given the instruction earlier in the sequence, Marques has cited no authority which compels this. And while we hesitate to hold that the order in which jury instructions are given is entirely irrelevant, we decline, on these facts, to fashion a rule designed to address the problem. We hold that Marques was not prejudiced by the instruction being given out of order.

### F. Consideration of Evidence Obtained After Marques Left the Conspiracy

■ Marques' final contention on appeal is that when he abandoned the venture, was arrested and cooperated with the authorities, the conspiracy ended as to him, and all acts and declarations by other conspirators thereafter should not have been considered in assessing his guilt. He was refused a jury instruction to that effect, and he appeals that ruling.

He was not entitled to such an instruction. The acts and declarations of coconspirators, done or made in furtherance of the conspiracy, are admissible against a conspirator whose participation has terminated because of arrest. *United States v. Wentz*, 456 F.2d 634 (9th Cir. 1972). *Accord, United States v. Payseur*, 501 F.2d 966 (9th Cir. 1974). *See United States v. Testa*, 548 F.2d 847 (9th Cir. 1977). Marques has offered no persuasive reasons for his being treated differently, and we decline to do so.[4]

### G. Prejudicial "Harry" Testimony

Appellant Harry Leroy cites as error the admission of certain testimony by DEA agent Davis in which Davis described a conversation between him and Spencer Marques regarding another person—"Harry" or "Larry"—to whom Spencer, through his brother William had sold $10,000 worth of methamphetamine precursors. Appellant Leroy claims this testimony was unfairly prejudicial as to him because it was vague and did not identify who this "Harry" or "Larry" was; nevertheless it allowed the jury to conclude improperly that it was he who was meant. He also claims that the testimony was inadmissible hearsay. Neither argument has merit.

■ In light of all the other testimony unquestionably admissible against appellant Leroy—including the "Harry" note found in Stewart's wallet, the sale by Leroy of methamphetamine to DEA agents when they asked to see "Harry" at the Alpine Meadows house, and the fact that the van in which large amounts of methamphetamine and chemical equipment were found had been rented by Harry Leroy—the "Harry" testimony objected to was merely cumulative and not unfairly prejudicial. Indeed, its relevance was substantially enhanced by the other testimony relating to appellant Leroy. Likewise, his hearsay argument has no merit. His statements to agent Davis were made during and in furtherance of the conspiracy, and as such, under Rule 801(d)(2), F.R.Evid., they were not hearsay.

■ Leroy also objects to references made by the prosecutor and testimony elicited from him regarding a trip he took to Columbia, during which he admittedly purchased cocaine. The prosecutor attempted to obtain an admission that the drugs had been purchased for resale, but the testimony was, at best, equivocal. Leroy testified the Columbia trip was a vacation and he

---

4. *Wentz, supra,* constitutes a severe limitation on the language in *Sandez v. United States,* 239 F.2d 239 (9th Cir. 1956) upon which Marques relies in arguing that acts and declarations subsequent to his arrest should not have been considered. The court in *Sandez* stated:

"We think the moment of any conspirator's arrest is decisive as to him, even if it should be maintained that the arrest of the first conspirator is not conclusive as to all. At that moment, the conspiracy has been thwarted, and presumably no overt act contributing to the conspiracy can possibly take place at least so far as the arrested conspirator is concerned."

239 F.2d at 243. This statement appears to have been based on *Fiswick v. United States,* 329 U.S. 211, 67 S.Ct. 224, 91 L.Ed. 196 (1946), which teaches, *inter alia*, that once a conspiracy ends, admissions by defendants cannot be employed against former coconspirators because those admissions are not made in furtherance of the conspiracy. The court in *Sandez* appears to have applied that rule to preclude the use of any acts or declarations against one who has been arrested and thus removed from the conspiracy. In light of *Wentz*, this result would no longer be proper, and it is questionable whether it was even a proper interpretation of *Fiswick*; that case also teaches that acts or declarations in furtherance of a conspiracy can be used against other coconspirators and only acts or declarations of one who has been arrested and thus removed from the conspiracy cannot be used against other conspirators even though the conspiracy is continuing.

purchased the drugs for his own use. The trial judge ruled the testimony admissible to show intent to deal with drugs and was relevant to the activity he was charged with. *See United States v. Segovia,* 576 F.2d 251 (9th Cir. 1978); *United States v. Batts,* 573 F.2d 599 (9th Cir. 1978), *cert. denied,* 439 U.S. 859, 99 S.Ct. 178, 58 L.Ed.2d 168 (1979).

Generally, evidence of prior similar illegal activity must be excluded from evidence because whatever relevance it may have is outweighed by the unfair prejudice it generates. *Bowie v. United States,* 345 F.2d 605 (9th Cir. 1965). *Accord, Benson v. United States,* 402 F.2d 576 (9th Cir. 1968). The intent exception to this rule, alluded to above, is recognized under Rule 404(b), F.R. Evid. However, those cases which discuss and apply that exception, e. g., *Segovia* and *Batts, supra,* show a closer relationship between the prior illegal activity allowed as evidence and the illegal activity which was the subject of the case then before the court. Here, different drugs (cocaine versus methamphetamine), different degrees of severity in the activity (personal use versus resale) and even different types of activities (purchase versus manufacture) were involved. The differences between the two activities were arguably too great to allow the inference that involvement in one showed intent to engage in the other. However, it is unnecessary to find that the admission of this evidence was erroneous in order for us to properly dispose of this issue. We find that, even assuming its admission was error, it was harmless beyond a reasonable doubt because other evidence against Leroy was substantial to the point of being overwhelming. *Compare United States v. Masters,* 450 F.2d 866 (9th Cir. 1971), *cert. denied,* 405 U.S. 1044, 92 S.Ct. 1329, 31 L.Ed.2d 587 (1972), *with Lyda*

*v. United States,* 321 F.2d 788 (9th Cir. 1963).

### H. *Scope of the Search of the House*

▮ During the search of the Alpine Meadows house, chemistry books containing methamphetamine recipes were written on pieces of paper, plus a jacket with methamphetamine residue imbedded in it, all belonging to appellant Belcher, were seized. He objects here to their admission into evidence because their seizure, he contends, exceeded the permissible scope of the warrant which authorized the search. Concededly, the warrant[5] makes no specific mention of methamphetamine or items related to its manufacture. Nevertheless, we find that the seizure of the books and the jacket was within the scope of the warrant for at least two reasons.

First, it is by now almost a cliché that affidavits submitted in support of applications for search warrants are to be read in a common-sense, non-technical manner. *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *United States v. Spearman,* 532 F.2d 132 (9th Cir. 1976). And while it is true that as a general rule, items seized pursuant to a warrant must be specifically mentioned in the warrant, e. g., *United States v. Sherwin,* 572 F.2d 196 (9th Cir. 1977), it makes no sense to interpret the terms of a warrant in a hypertechnical manner when the interpretation of the document upon which that warrant is based may be non-technical and common-sense. Thus it is perfectly reasonable to view the references made in the warrant to "[narcotics] and narcotic paraphernalia . . . or lab equipment indicating use, manufacture or distribution of narcotics . . ." to include methamphetamine, the technical definitions in 21

---

5. The warrant in question authorized the search for the following items:

"Marijuana in any form, including plants, seeds and hand-rolled cigarettes and any other narcotic substance; any containers of various types commonly associated with the storage of narcotics and narcotic paraphernalia consisting in part of and including syringes, needles, any tools or lab equipment indi-cating the use, manufacture or distribution of narcotics, together with articles of personal property tending to establish the identity of persons and control of premises, storage areas or containers where narcotics are found consisting in part of and including but not limited to utility company receipts, rent receipts, cancelled mail envelopes and keys."

U.S.C. § 812 notwithstanding. *See generally United States v. Mendenhall*, 596 F.2d 706 (6th Cir. 1979) (Weick, dissenting).

Second, in this case, the affidavit submitted with the application for the warrant made it clear that the agents were looking for, and expected to find, evidence of the manufacture of methamphetamine in the Alpine Meadows house. Furthermore, that affidavit was incorporated by reference into the warrant and thus became part of it. Belcher's claim that the warrant did not include within its scope the search for methamphetamine evidence is therefore incorrect. *See United States v. McCrea*, 583 F.2d 1083 (9th Cir. 1978); *United States v. Gusan*, 549 F.2d 15 (7th Cir.), *cert. denied*, 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977).

## IV. CONCLUSION

The convictions of Marques, Belcher and Leroy are all AFFIRMED.