**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**John BAGNARIOL, Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Gordon L. WALGREN,**
**Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Patrick GALLAGHER,**
**Defendant-Appellant.**

**Nos. 80–1820 to 80–1822.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 7, 1981.

Decided Dec. 21, 1981.

Rehearings and Rehearing En Banc
Denied Feb. 2, 1982.

Deborah J. Youngblood, Seattle, Wash., for Bagnariol.

Murray B. Guterson, Malcolm L. Edwards, Edwards & Barbieri, Seattle, Wash., for Walgren.

Thomas Hillier, Seattle, Wash., for Gallagher.

John C. Merkel, U.S. Atty., Seattle, Wash., for plaintiff-appellee.

Before BROWNING, Chief Judge, WRIGHT, Circuit Judge, and THOMPSON,* District Judge.

PER CURIAM:

Appellants appeal convictions on various counts of a twenty-nine count indictment resulting from a two-year investigation by the Federal Bureau of Investigation into gambling and alleged political corruption in the state of Washington. Appellant John Bagnariol was convicted on nine counts, appellant Gordon Walgren on three counts, and appellant Patrick Gallagher on fourteen counts.

Appellants challenge their convictions on numerous grounds. We conclude appellants' arguments are without merit and affirm the convictions for reasons which follow.

The government's evidence consisted principally of tapes of surreptitiously recorded conversations between government agents and appellants and testimony of government agents regarding such conversations. Factual recitals in this opinion are based upon the interpretation of this evidence that is most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

## I. DUE PROCESS

At the request of local authorities, the FBI joined an investigation of local gambling and political corruption in Vancouver, Washington. FBI Agent Harold Heald, posing as the representative of a fictitious California corporation named "So-Cal," led the undercover operation. State undercover agents introduced Heald to Don Buss, the owner of several cardrooms authorized under Washington law to conduct card games financed by the players. Heald represented to Buss that So-Cal was interested in purchasing cardrooms and also in participating in "house-backed" gambling if it were legalized in Washington. Heald expressed a desire to meet local political leaders to assure that legalized gambling would be expanded in Washington and that So-Cal's entry into it would not be opposed.

Buss introduced Heald to appellant Gallagher, a lobbyist and the secretary of the Cardroom Owners Association. Heald repeated So-Cal's interest in buying into and

---

* Honorable Bruce R. Thompson, Senior Judge, United States District Court for the District of Nevada, sitting by designation.

expanding legalized gambling and inquired into the current political climate for gambling legislation. Gallagher responded that legislation to expand gambling would be passed gradually, noting that appellant Bagnariol, Speaker of the Washington House of Representatives, was in favor of gambling legislation. Gallagher offered to introduce Heald to several "powerful political figures" who intended to expand and control legalized gambling in Washington and who could make Heald "certain assurances." Gallagher explained that direct bribes and payoffs were no longer used and that "some of the biggest hoods in the state are now running the state" because "they, in effect, could do better by being politically at the top and running things legally." Gallagher suggested Heald hire him to serve as So-Cal's public relations man and as liaison with state politicians.

Heald initiated the next several meetings with Gallagher. Gallagher assured Heald that he could advance So-Cal's interests through "modern corporate ways" rather than "old fashioned thug ways," stating, "You don't buy people anymore, you rent 'em." Heald responded that So-Cal was prepared to pay whatever was necessary. Gallagher said legalized gambling was coming to Washington and it was his job to make sure his friends controlled it. Gallagher identified Bagnariol as one of these friends. When asked how much money would be required, Gallagher said his friends would determine the amount, and would also guarantee the desired results.

Gallagher and Heald met periodically over the next five months. They negotiated an agreement under which appellants would assure passage of legislation legalizing gambling, appellants and So-Cal would control the legalized gambling, and each appellant would receive six percent of So-Cal's gambling profits. Gallagher then introduced Heald to Bagnariol and Walgren. Both expressed familiarity with the negotiations between Gallagher and Heald and assented to the terms upon which they had agreed.

Appellants Gallagher and Walgren argue that, notwithstanding proof they were predisposed to commit the crimes, the government's initiation of and involvement in the operation constituted "outrageous conduct" that violated their fifth amendment due process rights.

In *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971), the court recognized a due process defense based on excessive police involvement in the crime for which defendants were convicted. We reversed conspiracy and bootlegging convictions against defendants predisposed to commit these offenses because of the government's direct and continuous involvement over a long period of time in the creation and maintenance of the illegal distilling operation. The government's conduct amounted to "*creative* activity, substantially more intense and aggressive than the level of such activity charged against the Government in numerous entrapment cases we have examined." *Id.* at 787 (citation omitted).

In *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), the Supreme Court reversed a decision of this court applying *Greene* to reverse convictions for manufacturing and selling a controlled substance. The defendant had been operating a "speed" manufacturing laboratory when a government agent joined the operation and provided an ingredient essential to the manufacturing process. The Supreme Court held the entrapment defense unavailable because the defendant conceded predisposition to commit the offense. The Court also held that on the facts there was no defense based upon a violation of due process by the government. However, the Court's language did not clearly reject the possibility that such a defense might exist:

> While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, cf. *Rochin v. California*, 342 U.S. 165, [72 S.Ct. 205, 96 L.Ed. 183] (1952), the instant case is distinctly not of that breed. [The agent's] contribution of propanone to the

criminal enterprise already in progress was scarcely objectionable.... The law enforcement conduct here stops far short of violating that "fundamental fairness, shocking to the universal sense of justice," mandated by the Due Process Clause of the Fifth Amendment.

*Id.* at 431–32, 93 S.Ct. at 1642–1643.

The possibility of a due process defense based on the extent of government involvement in the commission of the offense also survived the Court's review in *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976). In *Hampton*, the Court affirmed a trial court's refusal to instruct the jury that the defendant could not be convicted if the jury found the government had supplied the defendant the illegal narcotic, which the defendant then sold to government agents. The plurality opinion, written by the author of *Russell* and representing the views of three Justices, would have foreclosed a due process defense based on government involvement if the defendant was predisposed to commit the crime. *Id.* at 490, 96 S.Ct. at 1650. The two concurring Justices found it unnecessary to decide whether predisposition precludes a due process defense as well as the entrapment defense, leaving that question open. *Id.* at 492–95, 96 S.Ct. at 1651–1652 (Powell, J., concurring). Three dissenting justices also declined to decide the constitutional issue. *Id.* at 497, 96 S.Ct. at 1653 (Brennan, J., dissenting). As this court has said, "*Hampton* left open the possibility that the conviction of a predisposed defendant may be reversed where the government's involvement in the criminal scheme reaches such an outrageous level as to violate due process." *United States v. Gonzales-Benitez*, 537 F.2d 1051, 1055 (9th Cir.), *cert. denied*, 429 U.S. 923, 97 S.Ct. 323, 50 L.Ed.2d 291 (1976). *See United States v. Prairie*, 572 F.2d 1316, 1319 & n.3 (9th Cir. 1978).

Although excess government involvement in a criminal enterprise may give rise to a due process defense, the courts rarely have found the defense available. The Supreme Court has never reversed a conviction on this ground. We have not done so since *Greene.* "This court has emphasized that the due process channel which *Russell* kept open is a most narrow one, to be invoked only when the government's conduct is so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Ryan*, 548 F.2d 782, 789 (9th Cir. 1976), *cert. denied*, 430 U.S. 965, 97 S.Ct. 1644, 52 L.Ed.2d 356 (1977). *See United States v. Smith*, 538 F.2d 1359, 1361 (9th Cir. 1976).

The government set Heald up as "bait" by spreading word generally that So-Cal was interested in promoting gambling legislation and in meeting politicians who shared that interest. This tactic led Heald to Gallagher, who volunteered the services of Bagnariol and Walgren. Gallagher stated that appellants planned to expand gambling gradually while maintaining control over its operation and were looking for the proper vehicle in which to vest that control.

The government, through So-Cal, provided that vehicle. Once the government had set its bait, appellants responded without further inducement by the government, joined with Heald in an equal partnership, and offered as their contribution the passage of necessary legislation in exchange for a portion of the proceeds from expanded gambling. It would be extreme to characterize the government's involvement as outrageous or shocking to the sense of justice.

The few convictions to be reversed on due process grounds have resulted from governmental involvement far more egregious than that presented here. In *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978), the Third Circuit found "a demonstrable level of outrageousness" justifying reversal on the following facts: At the direction of the government, an informant called the defendant, with whom the informant had previously manufactured "speed," and suggested they establish a laboratory to manufacture the drug. The government provided the chemicals, the equipment, and the site. The informant was in complete charge of the production process. The defendant's as-

sistance was minimal and at the specific direction of the informant. *Id.* at 380–81. Despite the defendant's clear predisposition, his conviction was reversed:

> This egregious conduct on the part of government agents generated new crimes by the defendant merely for the sake of pressing criminal charges against him when, as far as the record reveals, he was lawfully and peacefully minding his own affairs. Fundamental fairness does not permit us to countenance such actions by law enforcement officials and prosecution for a crime so fomented by them will be barred.

*Id.* at 381 (footnote deleted).

Based on *Twigg*, the Eastern District of Pennsylvania recently acquitted two subjects of the "Abscam" undercover operation. *United States v. Jannotti*, 501 F.Supp. 1182 (E.D.Pa.1980) (appeal pending). The court found as a matter of law that the defendants had no predisposition to commit the offenses, and had been entrapped by the government. *Id.* at 1200. The court further found that the governmental involvement violated due process even if defendants were predisposed to commit the crimes. *Id.* at 1204–05. Government agents had posed as representatives of an Arab sheik who desired to build a hotel complex in Philadelphia. The defendants, members of the City Council, agreed to assist the project because it would benefit the city. Government agents offered bribes as an additional inducement. Defendants had not requested money, and had made it clear none was necessary. The agents insisted the sheik would be unwilling to proceed with the project unless the pay-

ments were accepted. Defendants accepted the money, but did not agree to do anything inconsistent with their obligation to promote the interests of the city. 501 F.Supp. at 1200.[1]

The government's conduct in the present case does not rise to the level of outrageousness reflected in *Twigg* and *Jannotti*. Treating the evidence in the light most favorable to the government, as we must, we find the government's involvement reflected neither the dominant fomentation of *Twigg* nor the aggressive solicitation of *Jannotti*.[2]

If the conduct of the government was in some respects overzealous, it was clearly not "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Ryan*, 548 F.2d at 789. The convictions do not violate due process.

## II. JUROR MISCONDUCT

The Seattle public library is located across the street from the United States Courthouse in which the appellants were tried. Juror Paul Cohen found the library a convenient place to pass his time.

While at the library during the trial or the early part of deliberations, Mr. Cohen decided to check business publications for a reference to the fictional company So-Cal. He found none, although he discovered corporations with similar names.

Cohen reported his library visit and the results of his investigation to some of the other jurors. It appears he told them that as a normally prudent person he would have investigated any organization with which

---

1. In contrast to *Jannotti*, the Eastern District of New York, in *United States v. Myers*, 527 F.Supp. 1206 (E.D.N.Y.1981), found no due process violation in the Abscam investigation. The court found no impropriety in the government's setting up a business entity as an attractive target for corrupt overtures from congressmen generally. The court distinguished the tactics used in *Jannotti* by noting the government did not offer the *Myers* defendants the alternative of either accepting payment or losing a substantial benefit for their constituency.

2. Appellants also rely on *United States v. Archer*, 486 F.2d 670 (2d Cir. 1973), in which the Second Circuit reversed Travel Act and conspiracy convictions on narrow federal jurisdiction grounds. The court severely criticized the federal government's investigatory techniques, but expressly declined to decide whether the government's involvement required reversal. 486 F.2d at 676.

 Unlike the government activity in *Archer*, which we discuss later in this opinion, the conduct in this case violated no laws other than those under which appellants were prosecuted.

he intended to do business and that he found it odd appellants had not conducted a similar investigation.

The appellants learned of Cohen's actions after the guilty verdicts but before sentencing and moved for a mistrial. They contend that their belief in the legitimacy of So-Cal was a fundamental and integral part of their defense and that Mr. Cohen's research introduced material, essential, and improper evidence into the jury deliberations. They argue that the juror's independent research deprived them of a fair and impartial jury.

Upon learning of the library incident, the trial judge conducted evidentiary hearings, and the jurors were questioned individually. Questioning was intended to discover the nature of any extrinsic material, the extent of discussion, and other circumstances. The court attempted to avoid inquiry into the subjective effects on the jury of Mr. Cohen's discovery.

After its investigation, the trial court concluded that the extrinsic evidence made available by juror Cohen's investigation could not have affected the verdict. Noting its daily instructions to the jury to consider only evidence produced at trial, the court determined that the extrinsic information added nothing to the evidence before the jury, that the government's evidence overwhelmingly established the guilt of each appellant, and that the absence of a listing

for the company was irrelevant to any material issue in the case.

■ It is axiomatic that fundamental to the administration of justice is a fair and impartial jury. *E. g., Turner v. Louisiana,* 379 U.S. 466, 472–73, 85 S.Ct. 546, 549–550, 13 L.Ed.2d 424 (1965); *United States v. Hendrix,* 549 F.2d 1225, 1227 (9th Cir.), *cert. denied,* 434 U.S. 818, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977). The introduction of outside influences into the deliberative process of the jury is inimical to our system of justice. *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954).

■ The jury should reach its decisions only upon the evidence produced at trial, unaffected by extrinsic facts. The sixth amendment demands that evidence material to the guilt or innocence of an accused be subject to judicial control and the rules of evidence. *Turner v. Louisiana,* 379 U.S. at 472–73, 85 S.Ct. at 549–550.[3]

■ Although important interests are at stake for both the public and the defendants, the trial judge in the first instance, and the appellate court on appeal, must consider allegations of juror misconduct using only that evidence properly subject to consideration. Fed.R.Evid. 606(b).[4] Jurors may testify regarding extraneous prejudicial information or improper outside influences. They may not be questioned about the deliberative process or subjective effects of extraneous information, nor can

---

**3.** Extraneous information tending to show guilt or otherwise improperly to influence the jury must be carefully scrutinized. The jury's consideration of extraneous information deprives defendants of the opportunity to conduct cross-examination, offer evidence in rebuttal, argue the significance of the information to the jury, or request a curative instruction. *See Gibson v. Clanon,* 633 F.2d 851, 854 (9th Cir. 1980), *cert. denied,* 450 U.S. 1035, 101 S.Ct. 1749, 68 L.Ed.2d 231 (1981).

**4.** Fed.R.Evid. 606(b) reads:
Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or in-

dictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

The policy embraced by Fed.R.Evid. 606(b) serves several public interests. The rule discourages harassment of jurors by defendants after a guilty verdict, encourages free and open discussion in the jury room, reduces incentives for jury tampering, promotes finality, and respects the institution of the jury as a fact-finding body. *See McDonald v. Pless,* 238 U.S. 264, 267, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915); *Government of Virgin Islands v. Gereau,* 523 F.2d 140, 148 (3d Cir. 1975), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976).

such information be considered by the trial or appellate courts. *See United States v. Marques*, 600 F.2d 742, 747 (9th Cir. 1979), *cert. denied*, 444 U.S. 1019, 100 S.Ct. 674, 62 L.Ed.2d 649 (1980).

█ The trial court, upon learning of a possible incident of juror misconduct, must hold an evidentiary hearing to determine the precise nature of the extraneous information. The defendant is entitled to a new trial if the judge finds a "possibility that the extrinsic material could have affected the verdict." *United States v. Vasquez*, 597 F.2d 192, 193 (9th Cir. 1979).

The trial judge is uniquely qualified to appraise the probable effect of information on the jury, the materiality of the extraneous material, and its prejudicial nature. He or she observes the jurors throughout the trial, is aware of the defenses asserted, and has heard the evidence. The judge's conclusion about the effect of the alleged juror misconduct deserves substantial weight. *See Gibson v. Clanon*, 633 F.2d 851, 855 (9th Cir. 1980), *cert. denied*, 450 U.S. 1035, 101 S.Ct. 1749, 68 L.Ed.2d 231 (1981).

█ Nevertheless, because of the threat to the fundamental right of defendants to an impartial jury, the trial judge's determination must be considered in the context of the entire record. We conduct an independent review of the alleged juror misconduct, but remain mindful of the trial court's conclusions.

However simple it might be if every question on appeal could be solved by applying a per se test of some sort, that is not realistic.[5] Cases in which convicted defendants challenge their verdicts based on alleged juror misconduct require a considered review of the details and circumstances of each case. *United States v. Marques*, 600 F.2d 742, 747 (9th Cir. 1979), *cert. denied*,

444 U.S. 1019, 100 S.Ct. 674, 62 L.Ed.2d 649 (1980); *United States v. Alessio*, 528 F.2d 1079 (9th Cir.), *cert. denied*, 426 U.S. 948, 96 S.Ct. 3167, 49 L.Ed.2d 1184 (1976).

No bright line divides cases of juror misconduct that demand reversal from those that must be affirmed. But some similarities are discernible from cases in which convictions were reversed. Juror misconduct generally relates directly to a material aspect of the case. When finding reversible prejudice, courts have described a direct and rational connection between the extrinsic material and a prejudicial jury conclusion, as distinguished from a connection that arises only by irrational reasoning. Finally, reviewing courts have looked more harshly upon a conviction when the trial court fails to conduct evidentiary hearings.

In one of the most recent cases to reverse for juror misconduct, *Gibson v. Clanon*, 633 F.2d 851 (9th Cir.), *cert. denied*, 450 U.S. 1035, 101 S.Ct. 1749, 68 L.Ed.2d 231 (1981), jury members consulted a medical dictionary to determine the rarity of the defendant's blood type and the effect of a dosage of morphine on the ability of a witness to identify the defendant. The trial court conducted an evidentiary hearing and expressly concluded that he could not find the misconduct to be harmless beyond a reasonable doubt, but refused a mistrial on the erroneous belief that the correct standard was whether the extraneous evidence was more probably than not harmless. Noting that the evidence gathered by the jurors previously had been ruled inadmissible, that it significantly bolstered the government's case, and that the evidence was crucial, we reversed.

In *United States v. Renteria*, 625 F.2d 1279 (5th Cir. 1980), defendant alleged that an entire tape recording was provided to the jury, but that only portions of it had

---

**5.** Compare *United States v. Renteria*, 625 F.2d 1279 (5th Cir. 1980) ("If the trial judge finds that the jury had before it prejudicial material, the inquiry is complete and the conviction must be reversed."), *and Farese v. United States*, 428 F.2d 178 (5th Cir. 1970), *with Llewellyn v. Stynchcombe*, 609 F.2d 194 (5th Cir. 1980), *and United States v. McKinney*, 429 F.2d 1019 (5th

Cir.), *modified & rev'd on rehearing*, 434 F.2d 831 (5th Cir. 1970), *cert. denied*, 401 U.S. 922, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971). To the extent *Farese* and *Renteria* may be read to state a per se test in the Fifth Circuit, a reading with which we disagree, we decline to acknowledge such a test in this circuit.

been admitted. Because the trial judge had refused to conduct a hearing, the Fifth Circuit remanded to determine whether the jurors had heard prejudicial material. *See also Osborne v. United States*, 351 F.2d 111 (8th Cir. 1965).

A United States Deputy Marshal in *United States v. Greer*, 620 F.2d 1383 (10th Cir. 1980), explained to the jury the defendant's eligibility for sentencing under the Federal Youth Corrections Act. Finding such extraneous contact to be squarely within Supreme Court precedent, *Rogers v. United States*, 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975); *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), the court reversed. The only effect of information about sentencing and punishment is improperly to influence the jury in its decision about guilt or innocence. 620 F.2d at 1386 (Doyle, J., concurring). It is presumptively prejudicial. *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954).

In *United States v. Vasquez*, 597 F.2d 192 (9th Cir. 1979), the court's official file was left in the jury room. It contained inadmissible evidence that the court had denied a motion to dismiss and that the defendant previously had been prosecuted for a similar offense. Noting the highly prejudicial nature of the extraneous information and the extent of the jurors' examination of the file, the court reversed.

While examining an admitted exhibit, a shirt belonging to the defendant, the jury in *Farese v. United States*, 428 F.2d 178 (5th Cir. 1970), found a large amount of cash in a pocket. Finding a "strong probability of prejudice to the defendant then on trial upon a charge involving unlawful monetary gain," the court reversed. 428 F.2d at 182.

After examining these cases, we could conclude simply that the juror misconduct alleged here does not rise to the level of the cases supporting reversal and affirm on that basis. But we recognize the dangers in drawing a line so high that meritorious cases will be foreclosed because of unreasoned prior conclusions. We said recently:

Line drawing often creates artificial, discrete units where in reality a continuum exists. We should not be too quick to subject real situations to overreaching compartmentalization. Doing so only leads us farther down the road to absurdity, grasping more and more illogically for the distinctions which preserve the lines and compartments we initially created with such reverence. It is far more judicially honest to acknowledge the continuum and assert the genuine basis for our decision. In questions about jury incidents, we are ultimately not so concerned with their nature as with the prejudice they may have worked on the fairness of the defendant's trial.

*United States v. Armstrong*, 654 F.2d 1328, 1332 (9th Cir. 1981).

We continue, then, and examine the recent cases in which alleged juror misconduct has been found to be nonprejudicial. In *United States v. Armstrong*, 654 F.2d 1328 (9th Cir. 1981), a juror received telephone calls containing obscene language and veiled threats. The court affirmed the convictions, noting especially the better position of the district court to determine the existence or extent of any prejudice. The court also considered significant that the calls were not material to the guilt or innocence of the defendants.

In *United States v. Bassler*, 651 F.2d 600 (8th Cir. 1981), a juror took notes on the testimony each day after the proceedings were concluded, even though the judge expressly had instructed the jury not to do so. The juror also brought to the jury room notes from a book on rules of order. The court affirmed the conviction. It found the testimonial notes to be intrinsic to the deliberations, and determined that the material on rules of order was irrelevant to any material issue of the case.

In *United States v. Johnson*, 647 F.2d 815 (8th Cir. 1981), the court affirmed a conviction after the jury had heard unadmitted portions of a tape recording. The court concluded that the extraneous matter was irrelevant to any issue in the case. 647 F.2d at 817.

The court found no prejudicial error in *United States v. Bagley*, 641 F.2d 1235 (9th Cir. 1981). The trial judge, responding to a question from the jury, informed the jurors that a government witness had not been immunized, information not admitted at trial. The reviewing court noted the accuracy of the information and its admissible character, a curative instruction, and the trial court's finding of no prejudice.

In *Llewellyn v. Stynchcombe*, 609 F.2d 194 (5th Cir. 1980), the jury improperly considered a witness list containing references to arson, which had not been charged, and additional indictment numbers. The court affirmed, reasoning that no prejudice occurred because evidence of the arson had been produced at trial and the jury had been instructed that an indictment was not evidence.

In *Government of Virgin Islands v. Gereau*, 523 F.2d 140 (3d Cir. 1975), *cert. denied*, 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976), information concerning killings that occurred during the trial and rumors of investigations entered the jury room. Relying on the determination of the trial court and characterizing the incidents as "normal jury pressures and intra-jury influences," 523 F.2d at 151, the court declined to reverse.

In *United States v. Klee*, 494 F.2d 394 (9th Cir.), *cert. denied*, 419 U.S. 835, 95 S.Ct. 62, 42 L.Ed.2d 61 (1974), the jurors had discussed the case during trial, some allegedly forming conclusions. The court affirmed the conviction, noting that the trial judge "was in a better position . . . to determine whether what happened was prejudicial." 494 F.2d at 396.

In a case cited by defendants, *Paz v. United States*, 462 F.2d 740 (5th Cir. 1972),

the trial court had refused even to remove books about drugs from the jury room during a drug trial. The Fifth Circuit remanded for a hearing, but later upheld the trial court's finding that no prejudice had occurred. *Paz v. United States*, 473 F.2d 662 (5th Cir.), *cert. denied*, 414 U.S. 820, 94 S.Ct. 47, 38 L.Ed.2d 52 (1973).

Finding overwhelming evidence against the defendant, the court in *United States v. McKinney*, 429 F.2d 1019 (5th Cir.), *modified & rev'd on rehearing*, 434 F.2d 831 (5th Cir. 1970), *cert. denied*, 401 U.S. 922, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971), affirmed the conviction. Moreover, the extrinsic evidence was not relevant to any material issue in the case.

These cases illustrate that portion of the continuum in which jury misconduct fails to affect the jury's verdict. We note the similarities. The conclusion of the trial judge, while not determinative, is entitled to considerable deference. Reviewing courts will not disturb jury verdicts on appeal when extraneous information relates only to issues not material to the guilt or innocence of the defendant. And intrinsic jury processes will not be examined on appeal and cannot support reversal. *See generally United States v. Hockridge*, 573 F.2d 752, 758–59 (2d Cir.), *cert. denied*, 439 U.S. 821, 99 S.Ct. 85, 58 L.Ed.2d 112 (1978).

■ From our lengthy review of the cases, we conclude that the juror misconduct alleged here fails to warrant reversal. The trial judge conducted a prompt and thorough evidentiary investigation into juror Cohen's actions and applied the correct legal standard.[6]

■ We agree with ample precedent in attributing great weight to the finding that the evidence in no way interfered with or

---

6. The trial judge cited *United States v. Vasquez*, 597 F.2d 192 (9th Cir. 1979), and applied the standard of review articulated there:

> [T]he appellant is entitled to a new trial if there existed a reasonable possibility that the extrinsic material could have affected the verdict.

*Id.* at 193.

Constitutional errors demand a strict standard of review. *Chapman v. California*, 386

U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The *Vasquez* standard has been held equivalent to the standard announced in *Chapman. Gibson v. Clanon*, 633 F.2d 851, 853 (9th Cir. 1980), *cert. denied*, 450 U.S. 1035, 101 S.Ct. 1749, 68 L.Ed.2d 231 (1981). The trial court applied the correct standard when it found that the extrinsic evidence "could not have possibly tainted the verdict."

affected any juror's decision. *United States v. Bagley*, 641 F.2d 1235, 1241 (9th Cir. 1981); *Gibson v. Clanon*, 633 F.2d 851, 855 (9th Cir. 1980), *cert. denied*, 450 U.S. 1035, 101 S.Ct. 1749, 68 L.Ed.2d 231 (1981); *United States v. Renteria*, 625 F.2d 1279, 1284 (5th Cir. 1980); *United States v. Bohr*, 581 F.2d 1294, 1302 (8th Cir.), *cert. denied*, 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978); *United States v. Hockridge*, 573 F.2d 752, 756 (2d Cir.), *cert. denied*, 439 U.S. 821, 99 S.Ct. 85, 58 L.Ed.2d 112 (1978); *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir.), *cert. denied*, 434 U.S. 818, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977); *United States v. Klee*, 494 F.2d 394, 396 (9th Cir.), *cert. denied*, 419 U.S. 835, 95 S.Ct. 62, 42 L.Ed.2d 61 (1974); *United States v. McKinney*, 429 F.2d 1019 (5th Cir.), *modified and rev'd on rehearing*, 434 F.2d 831 (5th Cir. 1970), *cert. denied*, 401 U.S. 922, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971).

The information gathered by juror Cohen was irrelevant to the guilt or innocence of the appellants. By the time of trial it was undisputed that So-Cal did not exist, but was merely a front for the FBI investigation. Mr. Cohen's discovery that So-Cal was not listed in certain business directories confirmed that fact, but adds little more. The existence of So-Cal was immaterial.

Appellants concede this point, but argue that although the existence of the company was not at issue the reasonableness of the defendants' belief that So-Cal existed was crucial to their defenses. They assert that the investigation revealed to the jury either that the appellants did not care whether So-Cal existed, and consequently did not check, or that appellants checked on So-Cal, found that it did not exist, and continued to deal with the company with the knowledge that it was criminal.

Appellants did not assert as a defense that they believed they were dealing with a corporation whose name appeared in business publications. Any belief appellants may have had that So-Cal was legitimate would have been equally credible regardless

whether the company existed or whether its name appeared in a publication.

Mr. Cohen's independent research made appellants' belief neither more nor less credible. Implicit in the knowledge that So-Cal did not exist is that it would not be listed as a corporation in periodicals. The research merely confirmed what any reasonable juror already knew. *United States v. Armstrong*, 654 F.2d 1328, 1333 (9th Cir. 1981); *United States v. Johnson*, 647 F.2d 815, 817 (8th Cir. 1981); *see Farese v. United States*, 428 F.2d 178, 181 (5th Cir. 1970) (material information); *Osborne v. United States*, 351 F.2d 111, 118 (8th Cir. 1965) (highly damaging and prejudicial information); *cf. United States v. Vasquez*, 597 F.2d 192, 194 (9th Cir. 1979) (highly prejudicial information).

The extraneous information made available by Cohen's independent research was that So-Cal did not appear in two or three business publications and that the absence of a listing could be discovered in a short time. We fail to see any logical connection between the appearance of a So-Cal listing and the company's criminal nature.

A listed company just as easily could be a front for criminal activity as one not listed. Similarly, a corporation without a listing is no more criminal, by that fact alone, than any other company. The connection between the existence of So-Cal, which was not disputed, and the legitimacy of the corporation is too attenuated.

To find a material connection between the absence of a So-Cal listing and the appellants' belief in the legitimacy of So-Cal would require an assumption that the jury members reached an irrational conclusion, lacking in common-sense logic. But we must accept the jury as a rational body, fully capable of making the fine distinctions necessary to the fact-finding process. We are not called upon to isolate, examine, and negative each of the possible and irrational constructions on which a jury conceivably could rely.[7]

---

7. As we stated in *United States v. Nelson*, 419 F.2d 1237, 1245 (9th Cir. 1969):

Juries constantly convict, and the convictions are duly affirmed, on evidence upon which

Moreover, we discern very little difference in statements that juror Cohen could have offered had he not checked the library and those he actually made after his visit. He said that he went to the library and found in 15 minutes that So-Cal did not exist. We do not view that to be materially different from an assertion that he *could* go to the library and find out in 15 minutes that So-Cal did not exist.

We also note the vast body of evidence presented by the government, which tended to show the falsity of the appellants' claims to a reasonable belief in So-Cal's legitimate nature. We need not discuss the evidence in detail, but recognize the many tape recordings, testimony regarding conversations, and the circumstances surrounding the appellants' travels, all of which were well developed by the prosecution.

The trial judge found, and we agree, that "[e]vidence presented at trial ... overwhelmingly substantiated the guilt of each defendant." *See United States v. Bassler*, 651 F.2d 600, 602–03 (8th Cir. 1981); *United States v. Bagley*, 641 F.2d 1235, 1241 (9th Cir. 1981); *Llewellyn v. Stynchcombe*, 609 F.2d 194, 196 (5th Cir. 1980); *United States v. McKinney*, 429 F.2d 1019 (5th Cir.), *modified and rev'd on rehearing*, 434 F.2d 831 (5th Cir. 1970), *cert. denied*, 401 U.S. 922, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971).

Moreover, the judge clearly and carefully delivered instructions to the jury to consider only evidence produced at trial in reaching a verdict. These were given daily during the long trial and again upon summation. This fact alone might justify affirmance. *United States v. Bagley*, 641 F.2d 1235, 1241 (9th Cir. 1981); *Llewellyn v. Stynchcombe*, 609 F.2d 194 (5th Cir. 1980). It is all the more compelling when in combination with the immaterial nature of the information, its illogical connection to any relevant or prejudicial jury conclusions, and the trial court's thorough investigation of the incident.

Although we do not condone Mr. Cohen's independent research, we conclude that it

did not so affect the appellants' right to a fair trial that it requires reversal.

## III. JENCKS ACT

Agent Heald testified that shortly after each meeting with appellants (usually within a day) he wrote in longhand a complete draft of a report of the meeting. Heald sent the draft report to a stenographic pool for typing, compared the typed version with his handwritten draft and corrected misspelling and typographical errors, but did not make substantive changes. He then discarded the draft.

At trial, each appellant moved to suppress Heald's testimony, asserting the destruction of the longhand drafts of the typewritten reports violated the Jencks Act, 18 U.S.C. § 3500, and *United States v. Harris*, 543 F.2d 1247 (9th Cir. 1976). *Harris* prohibits the destruction of original interview notes taken by government agents that contain statements "potentially producible" under the statute.

Appellants' argument was rejected in *United States v. Kaiser*, 660 F.2d 724 (9th Cir. 1981), decided after the trial of this case. As we pointed out in *Kaiser*, the Jencks Act requires production only of statements "signed or otherwise approved" by the witness. The corrected typewritten reports were "signed or otherwise approved" by agent Heald, but the handwritten drafts from which they were typed were not.

Appellant Walgren's reliance on *United States v. Walden*, 578 F.2d 966, 970 (3d Cir. 1978) is misplaced. In *Walden*, the Third Circuit suggested that handwritten drafts of a final report written by a government agent might be deemed "adopted or approved" by the agent because he sent the handwritten drafts directly to his superior for review *before* having them typed. 578 F.2d at 570. On remand, the district court held that to approve or adopt a statement the witness must in some manner "affirmatively express his assent to the content of

none would hesitate to act but which cannot be said to exclude as a matter of inexorable

logic, every reasonable hypothetical consistent with innocence.

the writing," and that the agent had done so there by sending the drafts directly to his supervisor for review. 465 F.Supp. 255, 260–61 (E.D.Pa.1978), aff'd, 590 F.2d 85 (3d Cir.), cert. denied, 444 U.S. 849, 100 S.Ct. 99, 62 L.Ed.2d 64 (1979). In contrast, Heald did not send his reports to his superiors until he had reviewed and corrected the typewritten version.

Although *Harris* requires the preservation of notes that may be only "potentially producible" under the Jencks Act, the rationale of *Harris* is inapposite to the draft reports involved here. *Harris* relied heavily upon *United States v. Harrison*, 524 F.2d 421 (D.C. Cir. 1975), which held disclosure of an agent's final report was not an adequate substitute for disclosure of an agent's rough interview notes, reasoning:

> there is clearly room for misunderstanding or outright error whenever there is a transfer of information in this manner. In the best of good faith, the statement as recorded in the 302 report may, to some degree at least, reflect the input of the agent. In such a situation, the information contained in the rough notes taken from the witness himself might be more credible and more favorable to the defendant's position.

524 F.2d at 428. The court further recognized:

> [a]nd certainly we cannot consider it beyond the bounds of possibility that a report be distorted because of overzealousness on the part of the agent preparing it, since preparation of the report and the decision whether or not to preserve the notes are entirely within the discretion of a single agent acting alone.

*Id.* at 430 (citations omitted).

The typing of a handwritten draft and correction of the typewritten version does not entail the risk of distortion that inheres in the compilation of a report from rough notes. The copying presents no chance for inadvertent input from the agent; the correction of the typed copy offers very little. If Heald were bent on fabricating an account of the events, he had equal opportunity to tailor his observations to fit his conclusion in writing the original drafts.

Thus, there is no basis for any suggestion there may have been substantive differences between the longhand manuscripts sent to the typing pool and the corrected, typewritten reports approved by agent Heald and produced under the Jencks Act for appellants' use. In all previous cases applying the *Harris* preservation rule, there has been some basis for believing the destroyed material may have contained a more accurate account or recordation than the material eventually disclosed. *See United States v. Parker*, 549 F.2d 1217, 1223 (9th Cir.), cert. denied, 430 U.S. 971, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977); *United States v. Robinson*, 546 F.2d 309, 312 (9th Cir. 1976), cert. denied, 430 U.S. 918, 97 S.Ct. 1333, 51 L.Ed.2d 596 (1977); *United States v. Well*, 572 F.2d 1383, 1384 (9th Cir. 1978); *United States v. Finnegan*, 568 F.2d 637, 642 (9th Cir. 1977); *United States v. Marques*, 600 F.2d 742, 748 (9th Cir. 1979), cert. denied, 444 U.S. 1019, 100 S.Ct. 674, 62 L.Ed.2d 649 (1980). *See also United States v. Carrasco*, 537 F.2d 372, 377 (9th Cir. 1976).

We conclude the destruction of the drafts violated neither the Jencks Act nor the *Harris* preservation rule.

## IV. THE ENTERPRISE

Appellants Bagnariol and Gallagher argue that the government failed to prove the existence of an enterprise. They correctly assert that the enterprise is a separate and discrete element of a RICO violation. However, the government is not precluded from using the same evidence to establish both the element of an enterprise and the element of a pattern of racketeering. *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528–29, 69 L.Ed. 2d 246 (1981); *see United States v. Diecidue*, 603 F.2d 535, 545 (5th Cir. 1979), cert. denied, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980).

An enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct."

*United States v. Turkette*, 101 S.Ct. at 2528. The government produced sufficient evidence to establish the existence of such an enterprise. The appellants engaged in many conversations concerning the passing of legislation favorable to gambling in the state of Washington. They discussed forming a separate corporation that would hide their profits. Gallagher stressed that Walgren and Bagnariol held the power to control the expansion of gambling in Washington and to control its operation once made legal. Each appellant, either separately or with another appellant, met with agent Heald in furtherance of the scheme to liberalize gambling.

We believe these activities sufficiently establish the form of the association of the appellants. The purpose of the association was to make legal in the state of Washington a form of gambling from which appellants could profit. In *United States v. Zemek*, 634 F.2d 1159, 1167 (9th Cir. 1980), *cert. denied*, 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981), we stressed the broad scope of the enterprise definition. *See also United States v. Turkette*, 101 S.Ct. at 2532; *United States v. Elliott*, 571 F.2d 880, 897–900 (5th Cir.) (jury entitled to infer existence of an enterprise from largely or wholly circumstantial evidence), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978).

In light of our view of the evidence, we reject the contention that proof of the existence of the enterprise was deficient because none of the defendants did anything in furtherance of liberalizing Washington gambling laws. The argument rests on an interpretation of the indictment that is too narrow. The indictment reads:

The enterprise, as defined in Title 18, United States Code, Section 1961(4), was a group of individuals, to wit: JOHN BAGNARIOL, GORDON W. WALGREN, and PATRICK GALLAGHER, associated in fact for the purposes of: (a) legalizing and controlling certain unlawful gambling within the State of Washington, including, but not limited to, expanded cardroom gambling, casino gambling, and slot machines; (b) controlling the distribution and servicing of slot machines within the State of Washington; and (c) gaining political offices and official positions within the State of Washington, and using such political offices and official positions for personal financial gain; all through acts involving extortion, bribery, mail fraud, interstate travel in aid of racketeering, and by avoiding the requirements of the Public Disclosure Law of the State of Washington.

Defendants would have us limit the description of the enterprise to the portion ending with the words "personal financial gain," and ignore the rest as surplusage. We read the indictment to include the allegations "all through acts involving extortion, bribery, mail fraud, interstate travel in aid of racketeering and by avoiding the requirements of the Public Disclosure Law of the State of Washington" as part of its definition of the enterprise. The government adequately proved these activities. If the contention is that proof of the success of the enterprise was necessary, we reject that as contrary to all generally recognized law of joint criminal activity.

Gallagher suggests that the government relied solely on proof of the pattern of racketeering to establish the existence of the enterprise. Even if that were the case, the Supreme Court in *Turkette* recognized that "the proof used to establish these separate elements may in particular cases coalesce." 101 S.Ct. at 2528.

In any event, as we note above, the government presented ample evidence to show the existence of an ongoing organization functioning as a continuing unit. *See id.* That the evidence sometimes consisted of conduct constituting the pattern of racketeering activity is irrelevant.[8]

---

8. All three appellants argued that a wholly illegal enterprise cannot support a RICO conviction. Although recognizing that *United States v. Rone*, 598 F.2d 564, 573 (9th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980) rejects such a position in this circuit, they presented the argument in the hope that the Supreme Court would adopt the con-

## V. INTERSTATE COMMERCE

### A. RICO

Counts I and II of the indictment charged appellants with conspiracy to violate the RICO statute and with violation of that statute. Both offenses are defined in 18 U.S.C. § 1962(c),[9] which applies only to persons associated with an enterprise "engaged in, or the activities of which affect, interstate or foreign commerce."

■ Appellants argue that the government failed to establish the required nexus with interstate commerce. They point out correctly that the statute requires the activities of the enterprise, not each predicate act, to affect interstate commerce. *United States v. Rone*, 598 F.2d 564, 573 (9th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *accord, United States v. Stratton*, 649 F.2d 1066, 1075 (5th Cir. 1981).

■ The effect on commerce is an essential element of a RICO violation, but the required nexus need not be great. A minimal effect on interstate commerce satisfies this jurisdictional element. *United States v. Barton*, 647 F.2d 224, 233 (2d Cir. 1981); *United States v. Rone*, 598 F.2d at 573.

■ Appellants rely on *United States v. Rone*, 598 F.2d 564 (9th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980) and *United States v. Nerone*, 563 F.2d 836 (7th Cir. 1977), *cert. denied*, 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 801 (1978), to argue that the interstate activities charged as predicate offenses cannot also be used to support the interstate connection of the enterprise.

In *Nerone*, the court reversed a RICO conviction in which the government had defined the enterprise as a local gambling casino. Under that definition, the govern-ment was required to show a connection between the activities of the casino and interstate commerce, but failed to do so.

The court explained:

The Government might have successfully prosecuted the twelve defendants if it had attempted to introduce evidence showing that the "casino operation" affected commerce. Under the approach which has been taken in many reported decisions, only slight evidence would have been required. Here, because of apparent prosecutorial uncertainty about the theory of its case, ... the Government made no effort at all to connect the dice and card games to interstate commerce.

563 F.2d at 854–55.

The appellants cite this portion of the *Rone* opinion that seems to support their argument:

The statute requires that the activity of the *enterprise*, not each predicate act of racketeering, have an effect on interstate commerce. The statute refers to "any enterprise engaged in, or the activities of which affect, interstate or foreign commerce." The government must show a nexus of the enterprise to interstate or foreign commerce, albeit minimal, to satisfy the requirement.

598 F.2d at 573 (original emphasis) (citations omitted).

When read in context, the *Rone* language fails to offer appellants the foundation they need. The enterprise alleged was an association of the defendants for the purpose of committing acts of extortion. The court upheld the trial court's jury instruction that defendants could be found guilty if the jury found any one of three acts, two of which also served as predicate offenses, to have affected interstate commerce. The portion of the opinion quoted by appellants was

trary position of the First Circuit. *United States v. Turkette*, 632 F.2d 896 (1st Cir. 1980). The Supreme Court rejected the First Circuit's interpretation before oral argument. *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

**9.** 18 U.S.C. § 1962(c) reads:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

offered in answer to the *Rone* defendants' contention that at least two predicate acts must have been found to affect commerce.

In many cases, the government charges an enterprise consisting of a legitimate organization, the activities of which are conducted through a pattern of racketeering. For example, in *United States v. Stratton*, 649 F.2d 1066 (5th Cir. 1981), the enterprise was defined as Florida's Third Judicial Circuit. The RICO convictions were affirmed because of ample evidence on the record of the circuit's connection with interstate commerce. *Id.* at 1075 n.12.

Similarly, in *United States v. Altomare*, 625 F.2d 5 (4th Cir. 1980), the enterprise was alleged to be the county prosecutor's office. The interstate nexus was found in the "very nature of the powers and duties conferred" upon the office, as well as in interstate telephone calls from the office, the purchase of supplies and materials originating from without the state, and litigation involving residents of other states. *Id.* at 7–8. *See generally United States v. Long*, 651 F.2d 239, 241–42 (4th Cir. 1981) (enterprise defined as office of state senator); *United States v. Grzywacz*, 603 F.2d 682 (7th Cir. 1979), *cert. denied*, 446 U.S. 935, 100 S.Ct. 2152, 64 L.Ed.2d 788 (1980).

In both *Stratton* and *Altomare*, the predicate acts were not considered for jurisdictional purposes because they were unrelated to the activities of the enterprise. But when the government defines the enterprise as an association of persons formed for the purpose of conducting illegal acts, the same acts that constitute the activities of the enterprise are the subject of charges for predicate crimes. The government need not choose between charging these activities as predicate acts or proving the conduct as a basis for jurisdiction.

The interstate commerce nexus must result from the enterprise. It is permissible to find that nexus from acts also charged as predicate acts when those constitute the activities of the enterprise. In *Rone*, since

the enterprise was formed for the purpose of engaging in the extortionate collection of debts, the court held that an interstate commerce connection could be found either from the enterprise itself or from the activities of the enterprise, which were separately charged as predicate acts. 598 F.2d at 573.

Similarly, in *United States v. Diecidue*, 603 F.2d 535 (5th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980), the enterprise was an association formed for the purpose of committing various criminal acts. The government alleged as predicate acts some of the same activities cited as bases for the interstate connection, which included the use of long distance telephone calls, the purchase of dynamite originating in interstate commerce, and the destruction of automobiles used in activities affecting commerce.

In *United States v. Barton*, 647 F.2d 224 (2d Cir. 1981), the court found a sufficient interstate nexus on the basis of the defendant's bombing of buildings used in interstate commerce. *Id.* at 234. These bombings also had been charged separately as predicate acts for the RICO charge. *Id.* at 227 n.1. *See generally United States v. Malatesta*, 583 F.2d 748, 756 (5th Cir. 1978), *aff'd on rehearing en banc*, 590 F.2d 1379 (5th Cir.) (limited to reevaluation of unrelated issue), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979).

These cases demonstrate that the same acts that satisfy the interstate commerce nexus to the enterprise also may be alleged as predicate acts. Merely including specific conduct in an indictment as a separate predicate count for RICO purposes does not foreclose its use for jurisdictional purposes.

### B. *Hobbs Act*

Gallagher argues that the government failed to offer evidence sufficient to satisfy the interstate commerce element of his Hobbs Act conviction. We affirm.[10]

---

**10.** Defendant Bagnariol also was convicted of a Hobbs Act violation, but he does not argue for reversal. Had he urged reversal on a similar ground, our discussion here would apply equally to him.

■ The statutory language of the Hobbs Act,[11] displays a purpose "to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence." *Stirone v. United States*, 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960). An effect on interstate commerce is established by proof of an actual impact, however small, or in the absence of actual impact, by proof of a probable or potential impact. *United States v. Zemek*, 634 F.2d 1159, 1173 n.20 (9th Cir. 1980), *cert. denied*, 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981); *United States v. Glynn*, 627 F.2d 39, 41 (7th Cir. 1980); *United States v. Phillips*, 577 F.2d 495, 501 (9th Cir.), *cert. denied*, 439 U.S. 831, 99 S.Ct. 107, 58 L.Ed.2d 125 (1978).

Gallagher concedes the expansive nature of the interstate commerce requirement, but argues that because So-Cal was a fictitious organization, no potential future impact could be established. He cites *United States v. Merolla*, 523 F.2d 51 (2d Cir. 1975), and *United States v. Jannotti*, 501 F.Supp. 1182 (E.D.Pa.1980) (appeal pending), to argue that although a potential interstate commerce connection is enough the impact must be in fact potential.

■ Gallagher was convicted of an attempt to extort from So-Cal in return for his help in enacting legislation favorable to gambling in the state of Washington. The prosecution introduced expert testimony tending to show the effects on interstate commerce of expanded gambling activity, including the movement of tourists and workers from other states.

Because of the extensive effects on interstate commerce that would have developed from the anticipated legislation, we need not find the interstate nexus solely in the effects of the extortion on the fictitious corporation So-Cal. It is enough that the scheme, if successful, would have affected commerce.

For example, in *United States v. Staszcuk*, 517 F.2d 53 (7th Cir.) (en banc), *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975), defendant had extorted payment in exchange for withholding opposition to a zoning change that would permit construction of an animal hospital. The Hobbs Act conviction was affirmed, even though the structure never was built. The court found a sufficient interstate commerce connection in evidence that the proposed construction would have affected commerce, but for the fortuitous circumstance of the change in plans. *Id.* at 60. Moreover, the court reasoned that jurisdiction would not have been defeated even if the zoning change had not passed. *Id.* at 60 n.19. The potential effects on interstate commerce contemplated in the plan itself were sufficient.

Similarly, in *United States v. Gambino*, 566 F.2d 414 (2d Cir. 1977), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978), defendants were convicted under the Hobbs Act based on the extortion of FBI agents who operated a fictitious garbage collection company. The Second Circuit rejected the argument that the effect on interstate commerce was insufficient, holding that the garbage collection business was so wedded to interstate commerce that an actual effect was unnecessary. *Id.* at 419. Although the FBI-created company actually had purchased equipment from another state and had arranged to dump garbage in other states, the court found such an interstate connection unnecessary. *Id.*

In *United States v. Rindone*, 631 F.2d 491 (7th Cir. 1980), the FBI had supplied the money used in the extortionate transaction,

---

11. 18 U.S.C. § 1951. The relevant portions of the Hobbs Act read:

(a) Whoever in any way or degree obstructs, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to do so, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section ... (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

and the defendants argued that no interstate nexus was possible. The court affirmed the convictions, noting that jurisdiction had been established:

> in a number of cases where it was factually impossible that the extortion money could ever affect interstate commerce because the payment was intended to be immediately recovered, *United States v. Phillips*, 577 F.2d 495 (9th Cir.), *cert. denied*, 439 U.S. 831 [99 S.Ct. 107, 58 L.Ed.2d 125] (1978), where the victim corporation was an FBI-created shell that in fact had no interstate dealings, *United States v. Brooklier*, 459 F.Supp. 476 (C.D. Cal.1978), and where the entity extorted was only a speculative venture that never became established or purchased goods interstate, *United States v. Bellomini*, 454 F.Supp. 44, 47 (W.D.Pa.1978).

631 F.2d at 493.[12]

Gallagher's citation to *United States v. Merolla*, 523 F.2d 51 (2d Cir. 1975), fails to require a different conclusion. In *Merolla*, the court reversed a Hobbs Act conviction for lack of interstate commerce impact. It held that because the victim of the extortion only occasionally engaged in interstate commerce the connection was merely incidental. The court stated:

> The victim's purchase of interstate goods, however, must be of a continuing nature or the relationship between the extortion and any interstate commerce becomes merely conjectural.

*Id.* at 54.

Sufficient evidence was presented to enable the jury to conclude that the effects on interstate commerce from the anticipated gambling legislation would be continuing. Since the movement of persons and material into the state would be far from conjectural and incidental, *Merolla* fails to support Gallagher's position.

With his discussion of *United States v. Jannotti*, 501 F.Supp. 1182 (E.D.Pa.1980) (appeal pending), Gallagher attempts to assert the defense of legal impossibility. It fails.

In *United States v. Brooklier*, 459 F.Supp. 476 (C.D.Cal.1978), then-district Judge Pregerson carefully analyzed the issue of impossibility as a defense to a charge of attempt. The defendants had been convicted under count IV of the indictment of an attempt to violate the Hobbs Act, but argued that because the victim company was an FBI-created front, not involved in interstate commerce, no interstate effect was possible.

After carefully examining the available precedent, including *United States v. Oviedo*, 525 F.2d 881 (5th Cir. 1976); *United States v. Berrigan*, 482 F.2d 171 (3d Cir. 1973), and *United States v. Heng Awkak Roman*, 356 F.Supp. 434 (S.D.N.Y.), *aff'd*, 484 F.2d 1271 (2d Cir. 1973), *cert. denied*, 415 U.S. 978, 94 S.Ct. 1565, 39 L.Ed.2d 874 (1974), Judge Pregerson stated:

> In summary, there appear to be three different views among the circuits on impossibility as a defense to an attempt charge. Under the Third Circuit's *Berrigan* approach, impossibility, regardless of criminal intent, is a defense. Under this analysis Count IV should be dismissed because defendants' alleged plan to extort money . . . could not possibly have affected interstate commerce . . . . Under the Second Circuit's *Roman* approach, Count IV should not be dismissed because the indictment amply alleges that the defendants had the criminal intent to violate § 1951, and would have done so but for circumstances unknown to them that prevented an actual violation. Finally,

**12.** Notwithstanding its favorable citation to *United States v. Brooklier*, 459 F.Supp. 476 (C.D.Cal.1978), the *Rindone* court in dictum distinguished the case in which it is legally impossible that the extortion would affect commerce. 631 F.2d at 493.

Considering the favorable citation to and quotation of language from *Brooklier* that is found in *Rindone*, we are not convinced that

the court would reach a different result were it to confront a defense of legal impossibility.

Although we believe Gallagher's argument could be answered adequately by *Rindone*, we need not rely on it. The nexus to interstate commerce was established sufficiently by evidence showing the effects of liberalized gambling laws.

under the Fifth Circuit's *Oviedo* approach, Count IV should not be dismissed, as the acts of the defendants ... strongly and unequivocally corroborate an intent to violate the Hobbs Act.

459 F.Supp. at 481.

■■■ Judge Pregerson considered the merits of each approach and concluded that Fifth Circuit law should be followed:

The Fifth Circuit's standard, which requires objective acts to unequivocally corroborate the necessary criminal intent, properly accommodates the concerns underlying the conflicting views on the impossibility defense. Such an accommodation safeguards both the government's interest in deterring criminal conduct and the citizen's right not to be injured by "possible erroneous official conclusions about his guilty mind."

*Id.* at 482 (citing Enker, *Impossibility in Criminal Attempts—Legality and the Legal Process*, 53 Minn.L.Rev. 665, 668 (1969)).

The analysis in *Brooklier* disposes of Gallagher's impossibility defense.[13] His argument relies on *Jannotti*, which arose in the Third Circuit. We reject that circuit's approach to legal impossibility as a defense in favor of the law of the Fifth Circuit.

■■■ The government's expert witness offered detailed testimony about the potential impact of liberalized gambling laws in Washington. The evidence was sufficient for the jury to find the requisite effect on interstate commerce to satisfy the jurisdictional requirement.

---

**13.** The validity of the defense in this case, in any event, is questionable. The government did not rely on the interstate commerce effects of the extortion payment, but on the potential effects of the gambling legislation for which defendant agreed to work. The potential interstate commerce effects need not derive solely from the transaction involved in the extortion, but may arise from the natural consequences of the extortion. In this case, the natural consequences were increased gambling and its concomitant effect on interstate commerce.

**14.** 18 U.S.C. § 1952(a)(3) reads:

## C. Travel Act

Walgren was convicted of violating the Travel Act, 18 U.S.C. § 1952(a)(3)[14] by causing the use of an interstate facility, the telephone, with the intent to further the unlawful gambling legislation scheme. He argues that the government failed to prove that the telephone call upon which the Travel Act count was based was interstate. The call was made by Heald to Walgren in Olympia, Washington. Proof of the call's origin in Oregon is necessary to satisfy the interstate element.

On January 30, 1980, Walgren called agent Heald's residence in Portland, Oregon and recorded a message on Heald's telephone answering device. Heald returned the call to Walgren in Washington that day.

When Walgren's counsel asked Heald if he remembered the location of his call, Heald testified:

I don't. Probably it was my residence. I'm not sure.

■■■ We address Walgren's sufficiency of the evidence argument by asking whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (original emphasis). Evidence that makes the existence of the element only slightly more probable, by itself, is not enough. *Id.* at 320, 99 S.Ct. at 2790; *see United States v. Marolda*, 648 F.2d 623 (9th Cir. 1981).

■■■ Our review of the evidence presented by the government leads us to the con-

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

. . . . .

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

clusion that the jury reasonably could have found beyond a reasonable doubt that the telephone call crossed state lines. First, the content of the conversation, which was recorded, clearly implies that the call originated at a distant location south of Olympia, Washington. Relevant portions of the transcript read:

WALGREN: Is it warmer down there yet?

. . . .

HEALD: I've gotta go down to Eugene [Oregon] tomorrow. Why don't I try to finagle my schedule around and, you know, maybe I can get up there in . . . the next couple of days or whatever.

. . . .

WALGREN: Now, we could, you know, we could vary that, but it might be wise to come up here and look around and see what's happening.

HEALD: Oh, sure. Yeah. Okay, why don't I . . . why don't I do that and, oh, you'll mail that other stuff down to me, huh?

Second, the government presented evidence of a series of telephone conversations between December 14, 1979, and January 31, 1980, from Heald in Portland to the defendants in Washington. The evidence suggests that Heald was in Portland on January 29 and establishes that he was in Portland on January 31. That Heald was there on January 30 as well is not an irrational conclusion.

Considering Heald's testimony, evidence of the series of telephone calls originating from Portland, and the content of the conversation, the jury had before it sufficient direct and circumstantial evidence from which it could conclude beyond a reasonable doubt that the telephone call on January 30 crossed state lines.

Walgren's second challenge to the interstate commerce element of his Travel Act conviction rests on *Rewis v. United States*, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971), and *United States v. Archer*, 486 F.2d 670 (2d Cir. 1973). He argues that the government failed to prove that the interstate nature of the telephone call was a necessary and integral part of the Travel Act violation.

In *Rewis*, the court of appeals had affirmed the convictions of the operators of a gambling business based on the interstate travel of their customers. The Supreme Court reversed. It declined to extend the Travel Act to "criminal activity solely because that activity is at times patronized by persons from another State." 401 U.S. at 812, 91 S.Ct. at 1059.

The Court rejected the government's theory that the Travel Act is violated when operators of an illegal gambling operation reasonably could foresee the travel of customers from across state lines. *Id.* at 812, 91 S.Ct. at 1059. But it did endorse earlier "cases in which federal courts have correctly applied § 1952 to those individuals whose agents or employees cross state lines in furtherance of illegal activity." *Id.* Because no evidence was produced at trial that the defendants actively had encouraged out-of-state-patronage, the Court refused to apply the latter theory to them.

In one of the cases favorably cited by the Court, *United States v. Zizzo*, 338 F.2d 577 (7th Cir. 1964), *cert. denied*, 381 U.S. 915, 85 S.Ct. 1530, 14 L.Ed.2d 435 (1965), the operator of a gambling business argued that he did not travel interstate and was indifferent to the interstate travel of his employees. Affirming, the court found it "clear that the gambling business . . . caused the interstate travel by the three employees," and that the jury properly could have found that the defendant knew some of the employees lived outside the state. *Id.* at 580; *see United States v. Baker*, 611 F.2d 961, 963 n.3 (4th Cir. 1979).

Walgren was convicted of causing Heald to make an interstate telephone call. We find unpersuasive Walgren's argument that Heald was a customer of the illegal enterprise.

Heald was not a mere patron of the bribery scheme. The government produced evidence that Walgren and Heald were actively involved in the scheme itself, and that Walgren's telephone call on January 30

in fact caused the use of interstate facilities. *See United States v. Clark*, 646 F.2d 1259, 1267–68 (8th Cir. 1981); *United States v. Baker*, 611 F.2d 961, 963 (4th Cir. 1979); *United States v. Ryan*, 548 F.2d 782, 787 (9th Cir. 1976), *cert. denied*, 430 U.S. 965, 97 S.Ct. 1644, 52 L.Ed.2d 356 (1977); *United States v. Mazzio*, 501 F.Supp. 340, 343–44 (E.D.Pa.1980).

We find *United States v. Archer*, 486 F.2d 670 (2d Cir. 1973), inapposite. In *Archer*, federal agents created a scheme designed to elicit criminal activity from within the New York criminal justice system. The agents staged a fictitious arrest, falsified arrest records, and crossed state lines expressly for the purpose of causing defendants to use interstate facilities.[15]

The court found three interstate or foreign telephone calls made by defendant insufficient to satisfy the interstate requirements of the Act. It rejected two of the calls because they resulted from the government's plant of misinformation, which caused the defendant to make interstate telephone calls he otherwise would not have made. *Id.* at 682. The remaining call was rejected as " 'casual and incidental.' " *Id.* at 685.

In *United States v. O'Connor*, 635 F.2d 814 (10th Cir. 1980), the Tenth Circuit identified the two significant factors in *Archer*. The court noted that whether the defendant or government takes the initiative is a substantial difference. 635 F.2d at 817. Here, Walgren initiated the interstate telephone call by leaving a message on Heald's answering device.

Heald's residence was not established in Oregon solely to manufacture federal jurisdiction. His undercover operation had existed for nearly a year in Portland, in which he worked on another case before the Washington gambling scheme commenced. This is not a case, such as that in *Archer*, in which government agents manufactured federal jurisdiction. *See United States v. O'Connor*, 635 F.2d 814, 817 (10th Cir. 1980); *United States v. Perrin*, 580 F.2d 730, 736 (5th Cir. 1978), *aff'd*, 444 U.S. 37, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979); *United States v. Hall*, 536 F.2d 313, 327 (10th Cir.), *cert. denied*, 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285 (1976).

The *O'Connor* court identified the second factor to be the "casual and incidental" nature of the interstate telephone calls in *Archer*. 635 F.2d at 818. The transcript of the recorded telephone call on January 30 reveals the integral connection of the conversation to the illegal enterprise. Walgren referred to the Chairman of the Gambling Commission and to copies of legislative bills he intended to forward to Heald. He also mentioned talking to his partner about the sale of his trucking company, which he anticipated as a means of concealing his receipt of the bribe.[16]

In any event, the telephone call need not comprise the essence of the illegal activity. A Travel Act conviction needs "evidence of a continuous enterprise and

---

15. *Archer* has been characterized as a case involving "virtual entrapment," *United States v. Hall*, 536 F.2d 313, 327 (10th Cir.), *cert. denied*, 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285 (1976), and has been severely restricted. The Second Circuit itself referred to *Archer* as addressing a "federally provoked incident of local corruption." *United States v. Gambino*, 566 F.2d 414, 419 (2d Cir. 1977), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978).

Because of the *Archer* court's nearly overriding concern with the extreme nature of the government's tactics, the case cannot offer the generally applicable principles sought by Walgren.

16. The view that the Travel Act does not encompass minimal or incidental use of interstate facilities is not held uniformly by the circuits. Although the Second and Seventh Circuits appear to have adopted such an interpretation, *see United States v. Herrera*, 584 F.2d 1137 (2d Cir. 1978); *United States v. Altobella*, 442 F.2d 310 (7th Cir. 1971), the Fourth and Sixth Circuits have rejected it. *United States v. Also-brook*, 620 F.2d 139, 143–44 n.5 (6th Cir.), *cert. denied*, 449 U.S. 843, 101 S.Ct. 124, 66 L.Ed.2d 51 (1980); *United States v. Eisner*, 533 F.2d 987 (6th Cir.), *cert. denied*, 429 U.S. 919, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976).

Because we find more than an incidental use of interstate facilities in this case, we need not decide whether casual and incidental use fails to satisfy the Travel Act in this circuit.

one act in interstate commerce in furtherance of that enterprise." *United States v. Tavelman*, 650 F.2d 1133, 1140 (9th Cir. 1981); *accord, United States v. Kaiser*, 660 F.2d 724 (9th Cir. 1981). The evidence was sufficient to enable the jury to find that the telephone call was in furtherance of the enterprise. *See United States v. O'Connor*, 635 F.2d 814, 817–18 (10th Cir. 1980); *United States v. Herrera*, 584 F.2d 1137, 1145–47 (2d Cir. 1978). *See generally United States v. Colacurcio*, 499 F.2d 1401, 1406 (9th Cir. 1974).

### D. *Mail Fraud*

Walgren also attacks his conviction under Count XXVII for mail fraud, 18 U.S.C. § 1341.[17] Walgren received indirectly from Heald a contribution to his campaign for state Attorney General. Walgren was required by state law to report the contribution to the Public Disclosure Commission either himself or through his political committee. His committee's March 10, 1980 public disclosure report did not include this contribution and Walgren did not report it personally. The indictment charged Walgren "knowingly caused to be delivered by mail" the committee's March report for the purpose of executing the gambling scheme.

Walgren argues his conviction under this count was invalid because the political committee's report included all contributions of which the committee was aware and because filing the report was compelled by state law. He cites *Parr v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960). In *Parr*, the defendants schemed to embezzle school district funds and mailed tax assessments to raise the funds to be embezzled. The Supreme Court reversed on the ground that government failed to prove defendants used the mails for the

purpose of executing their embezzlement scheme. 363 U.S. at 391, 80 S.Ct. at 1183. The Court held that the mailing of the tax assessments was not an unlawful step in the execution of the fraudulent scheme because the defendants were required by law to assess and collect the taxes and because the tax assessments were neither alleged nor proved to be excessive, padded or in any way illegal. *Id.* at 387, 391, 80 S.Ct. at 1181–1183.

Walgren's reliance on *Parr* assumes the legality of the March financial disclosure report mailed by his political committee. Walgren contends on appeal that the report was accurate because it disclosed all contributions known to the committee and that he could have complied with the disclosure law by reporting the contribution personally.

 Heald's contribution to Walgren's campaign was a camouflaged portion of the payoff for Walgren's political influence. Walgren expressed his intention to withhold disclosure of the payment to maintain its secrecy. He was responsible for reporting Heald's contribution either personally or through his committee. By doing neither, Walgren caused the committee to mail a disclosure report that was inaccurate because it did not include Heald's contribution. Walgren cannot cure the inaccuracy now by arguing he could have reported the contribution personally. He did not in fact do so.

Walgren's scheme to enrich himself by his use of his legislative position required profits to be hidden. By causing the committee to submit an inaccurate disclosure report, he hoped to conceal the receipt of a service of value. With such a design in mind, he cannot now argue that the mailing was not in furtherance of his illegal scheme.

---

**17.** 18 U.S.C. § 1341 provides in relevant part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

## VI. CONCLUSION

The appellants' arguments do not justify reversal. The convictions are affirmed.